**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | | |
|---|---|---|
| CLIFFORD CHARLES TYLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:12-CV-00523-GJQ |
| | ) | |
| ERIC HOLDER, Attorney General of the United States *et al.*; | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## FEDERAL DEFENDANTS' MOTION TO DISMISS

Now comes the United States of America on behalf of Federal Defendants, the Attorney General of the United States, in his official capacity; the U.S. Department of Justice; the Bureau of Alcohol, Tobacco, Firearms and Explosives; the Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives, in his official capacity; the Deputy Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives, in his official capacity; the Federal Bureau of Investigation; the Director of the Federal Bureau of Investigation, in his official capacity; and the United States of America (collectively "Defendants" or "Federal Defendants"), through undersigned counsel, and respectfully moves this Court to dismiss all claims against them for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). The basis for this motion is set forth in the attached Memorandum of Law in Support of Federal Defendants' Motion to Dismiss. Pursuant to Local Civil Rule 7.1(d), on September 24, 2012, undersigned counsel contacted counsel for Plaintiff, who stated that this Motion would be opposed.

Dated: October 1, 2012

Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General

PATRICK A. MILES, JR.
United States Attorney

SANDRA M. SCHRAIBMAN
Assistant Director
Federal Programs Branch

    /s/ Andrew Zee
M. ANDREW ZEE (CA Bar #272510)
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue NW, Room 7314
Washington, DC  20530
Telephone:  (202) 305-8648
Fax:  (202) 616-8470
Email:  m.andrew.zee@usdoj.gov

*Counsel for Federal Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | | |
|---|---|---|
| CLIFFORD CHARLES TYLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:12-CV-00523-GJQ |
| | ) | |
| ERIC HOLDER, Attorney General of the United States *et al.*; | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**<u>MEMORANDUM OF LAW IN SUPPORT OF
FEDERAL DEFENDANTS' MOTION TO DISMISS</u>**

# **TABLE OF CONTENTS**

INTRODUCTION .......................................................................................................... 1

STATUTORY BACKGROUND ..................................................................................... 2

    I.    Section 922(g)(4)................................................................................................. 2

    II.   Section 925(c) ...................................................................................................... 4

    III.  The NICS Improvement Amendments Act Of 2007...................................... 6

PLAINTIFF'S COMPLAINT......................................................................................... 8

ARGUMENT ................................................................................................................ 10

    I.    No Individual Capacity Claims Against Federal Officials Have Been Or May Be Asserted Here.................................................................................................... 12

    II.   Plaintiff's Second Amendment Claim Lacks Merit. ..................................... 13

           A.    The Sixth Circuit's Framework For Assessing Second Amendment Challenges ................................................................................. 15

           B.    The Second Amendment Does Not Extend To Individuals Who Have Been Committed As A Result Of Mental Illness..................................... 16

           C.    Section 922(g)(4) Nonetheless Satisfies The "Appropriate Level" Of Judicial Scrutiny Because It Is Substantially Related To An Important Governmental Interest. ............................................................................ 21

                 1.    At Most, Intermediate Scrutiny Is The Appropriate Standard To Be Applied To A Second Amendment Challenge Under Prong Two Of The *Greeno* Analysis ............................................................. 22

                 2.    Section 922(g)(4)Substantially Relates to the Important Governmental Interest of Preventing Firearm Violence and Therefore Withstands Intermediate Scrutiny. ............................... 25

          a.    It Was Reasonable For Congress To Rely On Past Commitment Based On Mental Illness Rather Than Individualized Evidence Of Future Dangerousness As A Basis For Disarmament. ................................................................... 27

          b.    Though Not Required To Satisfy Intermediate Scrutiny, Empirical Evidence Shows That Persons Who Have Been Involuntarily Committed Pose An Enhanced Risk Of Violence, Including Suicide, And A Continuing Prohibition Is Therefore Reasonable. .......................................................................... 32

          c.    Empirical Studies Indicating A High Rate Of Recurrence Of Mental Illness Further Support Congress's Decision To Impose A Continuing Disability Under § 922(g)(4). .......................... 37

III.   Plaintiff's Claims Under The Due Process Clause Of The Fifth Amendment Lack Merit ..................................................................................................................... 39

      A.     Plaintiff Fails To State A Valid Equal Protection Claim. .......................... 39

      B.     Plaintiff Has Failed To State A Viable Due Process Claim..................... 42

          1.    Plaintiff's Alleged Lack Of Notice And Opportunity To Be Heard With Respect To § 922(g)(4)'s Prohibition Does Not Constitute A Due Process Violation.................................................................. 43

          2.    The Absence Of A Mechanism Under Federal Or Michigan Law To Obtain Relief From § 922(g)(4)'s Prohibition Does Not Constitute A Due Process Violation. ............................................. 47

CONCLUSION.................................................................................................................... 50

# TABLE OF AUTHORITIES

## CASES

*37712, Inc. v. Ohio Dep't of Liquor Control*,
    113 F.3d 614 (6th Cir. 1997) ................................................................. 47

*ACLU of Ky. v. McCreary County*,
    607 F.3d 439 (6th Cir. 2010) ................................................................. 17

*Albright v. Oliver*,
    510 U.S. 266 (1994) ............................................................................. 39

*Barefoot v. Estelle*,
    463 U.S. 880 & n.7 (1983) .................................................................... 29

*Barrett v. United States*,
    423 U.S. 212 (1976) ............................................................................. 27

*Bassett v. Nat'l Collegiate Athletic Ass'n*,
    528 F.3d 426 (6th Cir. 2008) ................................................................... 8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................. 10

*Bernstein v. Pataki*,
    233 F. App'x 21 (2d Cir. 2007) ............................................................. 24

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
    239 U.S. 441 (1915) ............................................................................. 46

*Black v. Snow*,
    272 F. Supp. 2d 21 (D.D.C. 2003) ........................................................ 49

*Bd. of Trs. of State Univ. of New York v. Fox*,
    492 U.S. 469 (1989) ............................................................................. 26

*Boland v. Holder*,
    682 F.3d 531 (6th Cir. 2012) ................................................................... 8

*Bolling v. Sharpe*,
    347 U.S. 497 (1954) ............................................................................. 39

*Bryan v. United States*,
    524 U.S. 184 (1998)............................................................................... 43

*Ciavone v. McKee*,
    2009 WL 2959737 (W.D. Mich. Sept. 10, 2009) ................................. 24, 41

*Clark v. Jeter*,
    486 U.S. 456 (1988).............................................................................. 25

*Coleman v. Martin*,
    363 F. Supp. 2d 894 (E.D. Mich. 2005)................................................. 21

*Comm. Mental Health Servs. of Belmont v. Mental Health & Recovery Bd.*,
    150 F. App'x 389 (6th Cir. 2005)............................................................ 12

*Connecticut Department of Public Safety v. Doe*,
    538 U.S. 1 (2003)....................................................................... 42, 48, 49

*Cospito v. Heckler*,
    742 F.2d 72 (3d Cir. 1984)..................................................................... 41

*Craigmiles v. Giles*,
    312 F.3d 220 (6th Cir. 2002) ................................................................ 25

*Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*,
    648 F.3d 365 (6th Cir. 2011) ......................................................... 40460

*D.W. v. Rogers*,
    113 F.3d 1214 (11th Cir. 1997) ............................................................ 41

*Dickerson v. New Banner Inst.*,
    460 U.S. 103 (1983)........................................................................ 27, 29

*District of Columbia v. Heller*,
    554 U.S. 570 & n.26 (2008)........................................................... *passim*

*Ernst J. v. Stone*,
    452 F.3d 186 (2d Cir. 2006).................................................................. 24

*Estelle v. Smith*,
    451 U.S. 454 (1981).............................................................................. 29

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) .......................................................... 15, 23

iv

*Feit v. Ward,*

 886 F.2d 848 (7th Cir. 1989) ................................................................ 12

*Fla. Bar v. Went For It, Inc.,*

 515 U.S. 618 (1995) ............................................................................... 32

*Francis S. v. Stone,*

 221 F.3d 100 (2d Cir. 2000) .................................................................. 24

*Frank v. Relin,*

 1 F.3d 1317 (2d Cir. 1993) .................................................................... 12

*GeorgiaCarry.Org, Inc. v. Georgia,*

 764 F. Supp. 2d 1306 (M.D. Ga. 2011) ................................................ 23

*Graham-Humphreys v. Memphis Brooks Museum of Art,*

 209 F.3d 552 (6th Cir. 2000) ................................................................ 46

*Grand Jury Subpoena John Doe v. United States,*

 150 F.3d 170 (2d Cir. 1998) .................................................................. 25

*Grider v. Abramson,*

 180 F.3d 739 (6th Cir. 1999) ................................................................ 25

*Heller v. District of Columbia,*

 698 F. Supp. 2d 179 (D.D.C. 2010) ......................................... 22, 23, 38

*Huddleston v. United States,*

 415 U.S. 814 (1974) ............................................................................... 27

*J.W. v. City of Tacoma,*

 720 F.2d 1126 (9th Cir. 1983) .............................................................. 41

*Johnson v. City of Cincinnati,*

 310 F.3d 484 (6th Cir. 2002) ................................................................ 25

*Kirby v. City of Elizabeth,*

 388 F.3d 440 n.10 (4th Cir. 2004) ........................................................ 12

*Lewis v. United States,*

 445 U.S. 55 n.9 (1980) .................................................................... 38, 47

*McDonald v. City of Chicago,*

 130 S. Ct. 3020 (2010) .......................................................................... 14

v

*Molina-Crespo v. U.S. Merit Sys. Prot. Bd.,*
  547 F.3d 651 (6th Cir. 2008) ............................................. 46

*Mullis v. United States,*
  230 F.3d 215 (6th Cir. 2000) ........................................ 5, 48

*Nasierowski Bros. Inv. Co. v. City of Sterling,*
  949 F.2d 890 (6th Cir. 1991) ............................................ 47

*Neinast v. Bd. of Trustees of Columbus Metro. Library,*
  346 F.3d 585 (6th Cir. 2003) ........................................ 26, 38

*Nixon v. Shrink Mo. Gov't PAC,*
  528 U.S. 377 (2000) ...................................................... 32

*Nordyke v. King,*
  644 F.3d 776 (9th Cir. 2011) ............................................ 39

*Paige v. Coyner,*
  614 F.3d 273 (6th Cir. 2010) ............................................ 10

*Peterson v. LaCabe,*
  783 F. Supp. 2d 1167 (D. Colo. 2011) .................................. 23

*Petramala v. U.S. Dep't of Justice,*
  2012 WL 4357925 (9th Cir. Sept. 25, 2012) ............................. 16

*Plyler v. Doe,*
  457 U.S. 202 (1982) ...................................................... 41

*Redford v. U.S. Dep't of Treasury,*
  691 F.2d 471 (10th Cir. 1982) ........................................... 29

*Schweiker v. Wilson,*
  450 U.S. 221 (1981) .................................................. 41, 42

*Schweiker v. Wilson,*
  231 F. Supp. 2d 376 (D. Me. 2002) ...................................... 45

*Scott v. Flowers,*
  910 F.2d 201 (5th Cir. 1990) ............................................ 12

*Tennessee Scrap Recyclers Ass'n v. Bredesen,*
  556 F.3d 442 (6th Cir. 2009) ............................................ 47

*U.S. Dep't of the Treasury v. Galioto*,

    477 U.S. 556 (1986) ................................................................................................. 4

*United States v. Baker*,

    197 F.3d 211 (6th Cir. 1999) ............................................................... 43, 45, 47

*United States v. Bean*,

    537 U.S. 71 (2002) ................................................................................................... 4

*United States v. Beavers*,

    206 F.3d 706 (6th Cir. 2000) ............................................................................. 44

*United States v. Bledsoe*,

    2008 WL 3538717 (W.D. Tex. Aug. 8, 2008) ............................................... 23

*United States v. Buffaloe*,

    449 F.2d 779 (4th Cir. 1971) ............................................................................. 30

*United States v. Butler*,

    637 F.3d 519 (5th Cir. 2011) ............................................................................. 43

*United States v. Carey*,

    602 F.3d 738 (6th Cir. 2010) ............................................................... 14, 39, 40

*United States v. Chamberlain*,

    159 F.3d 656 (1st Cir. 1998), ....................................................................... 27, 28

*United States v. Chester*,

    628 F.3d 673 (4th Cir. 2010) ............................................................... 15, 23, 24

*United States v. Foley*,

    871 F.2d 235 (1st Cir. 1989) ............................................................................. 31

*United States v. Greeno*,

    679 F.3d 510 (6th Cir. 2012) ............................................................... 15, 21, 22

*United States v. Haire*,

    89 F. App'x 551 (6th Cir. 2004) .................................................................. 44, 46

*United States v. Jones*,

    569 F. Supp. 395 (D.S.C. 1983) ....................................................................... 30

*United States v. Khami*,

    362 F. App'x 501 (6th Cir. 2010) ..................................................................... 16

*United States v. Marzzarella*,

   614 F.3d 85 (3d Cir. 2010) ........................................................................ 14, 23, 26

*United States v. McRobie*,

   2009 WL 82715 (4th Cir. 2009) ........................................................................ 16

*United States Miller*,

   604 F. Supp. 2d 1162 (W.D. Tenn. 2009) ........................................................ 23, 38

*United States v. Napier*,

   233 F.3d 394 (6th Cir. 2000) ........................................................................ 44

*United States v. Reese*,

   627 F.3d 792 (10th Cir. 2010) .................................................................. 15, 23, 24

*United States v. Rehlander*,

   666 F.3d 45 (1st Cir. 2012) ...................................................................... 27, 28, 30

*United States v. Rene E.*,

   583 F.3d 8 (1st Cir. 2009) ........................................................................ 17

*United States v. Salerno*,

   481 U.S. 739 (1987) .............................................................................. 25

*United States v. Skoien*,

   614 F.3d 638 (6th Cir. 2010) .................................................................. 14, 25, 32

*United States v. Smith*,

   742 F. Supp. 2d 855 (S.D. W. Va. 2010) ........................................................ 23

*United States v. Staten*,

   666 f.3d 154 (4th Cir. 2011) ...................................................................... 31

*United States v. Waters*,

   23 F.3d 29 (2d Cir. 1994) ........................................................................ 4, 33

*United States v. Williams*,

   616 F.3d 685 (7th Cir. 2010) ...................................................................... 23

*United States v. Yancey*,

   621 F.3d 681 (7th Cir. 2010) ...................................................................... 23

*Washington v. Glucksberg*,

   521 U.S. 702 (1997) .............................................................................. 25

viii

*Weinberger v. Salfi*,

    422 U.S. 749 (1975) ..................................................................................... 28

*Weismiller v. Lane*,

    815 F.2d 1106 n.7 (7th Cir. 1987) ............................................................... 41

*Wolfe v. Strankman*,

    392 F.3d 358 n.2 (9th Cir. 2004) ................................................................. 12


## UNITED STATES CONSTITUTION

U.S. Const. amend. II ............................................................................................ 13

## FEDERAL STATUTES

18 U.S.C. § 922 ............................................................................................ *passim*

18 U.S.C. § 924(a)(2) ............................................................................................ 43

18 U.S.C. § 925 ............................................................................................ *passim*

## STATE STATUTES

Mich. Comp. Laws §§ 330.1451-68 ..................................................................... 32

## REGULATIONS

27 C.F.R. § 478.144 ................................................................................................ 4

28 C.F.R. § 0.130(a)(1) ........................................................................................... 4

## OTHER AUTHORITIES

Adam Winkler, *Scrutinizing the Second Amendment*,

    105 Mich. L. Rev. 683 (2007) ..................................................................... 38

B.L. Tanney, *Psychiatric Diagnoses and Suicidal Acts*, *in*

    R.W. Maris *et al.*, COMPREHENSIVE TEXTBOOK OF SUICIDOLOGY (New York 2000) ............. 34

D.E. McNeill *et al.*, *The Relationship Between Aggressive Attributional Style and*

    *Violence by Psychiatric Patients*,

    71 J. CONSULTING & CLINICAL PSYCHOL. 399 (2003) ........................................ 37

D.H.J. Herman, *Barriers to Providing Effective Treatment: A Critique of Revisions in*

    *Procedural, Substantive, and Dispositional Criteria in Involuntary Civil Commitment*,

    39 Vand. L. Rev. 83 (1986) .......................................................................... 37

ix

Donald Dowd, *The Relevance of the Second Amendment to Gun Control Legislation*,
58 Mont. L. Rev. 79 (1997) ................................................................................................ 38

Don B. Kates, Jr., *The Second Amendment: A Dialogue,*,
49 Law & Contemp. Probs. 143 (1986) .............................................................................. 19

Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*,
60 Hastings L.J. 1339 (2009) .............................................................................................. 19

Douglas J. Wiebe, *Homicide and Suicide Risks Associated With Firearms in the Home: A National Case-Control Study*,
41 ANNALS OF EMERGENCY MED. 771 (Jun. 2003) ............................................................ 36

Frederick E. Vars & Amanda E. Adcock, *Do the Mentally Ill Have a Right to Bear Arms?*,
48 Wake Forest L. Rev. ___ (forthcoming 2012) ............................................................... 34

H.J. Steadman *et al.*, *Violence by People Discharged From Acute Psychiatric Inpatient Facilities and by Others in the Same Neighborhoods*,
55 ARCH. GEN. PSYCHIATRY 393 (1998) ............................................................................ 34

J.R. Simpson, *Bad Risk? An Overview of Laws Prohibiting Possession of Firearms by Individuals With a History of Treatment for Mental Illness*,
35 J. AM. ACAD. PSYCHIATRY LAW 330 (2007) ................................................................. 36

L.E. Saltzman *et al.*, *Weapon Involvement and Injury Outcomes in Family and Intimate Assaults*,
267 J. AM. MED. ASS'N 22 (1992) ..................................................................................... 35

M.A. Ilgen *et al.*, *Mental Illness, Previous Suicidality, and Access to Guns in the United States*,
59 PSYCHIATRIC SERVICE 198-200 (2008) ......................................................................... 36

M. Miller & D. Hemenway, *Guns and Suicide in the United States*,
359 NEW ENGLAND J. MED. 989-91 (2008) ....................................................................... 35

Patrick J. Charles, *"Arms for Their Defence"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated In McDonald v. City of Chicago*,
57 Clev. St. L. Rev. 351 (2009) .......................................................................................... 18

R.A. Friedman, M.D., *Violence and Mental Illness—How Strong Is the Link?*,

NEW ENGLAND J. MED. 2064 (2006).......................................................................... 33

Richard Van Dorn *et al.*, *Mental Disorder and Violence*,

    47 SOCIAL PSYCHIATRY & PSYCHIATRIC EPIDEMIOLOGY 487, 487 (2012) .............................. 34

Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-*

    *Americanist Reconsideration*,

    80 Geo. L.J. 309 (1991) ......................................................................................... 18

Robert E. Shalhope, *The Armed Citizen in the Early Republic*,

    49 Law & Contemp. Probs. 125 (1986) .................................................................... 19

Saul Cornell, *"Don't Know Much About History" The Current Crisis in Second Amendment*

    *Scholarship*,

    29 N. Ky. L. Rev. 657 (2002) ................................................................................. 18

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun*

    *Control*,

    73 Fordham L. Rev. 487 (2004)................................................................................ 19

Seena Fazel *et al.*, *The Population Impact of Severe Mental Illness on Violent Crime*,

    163 AM. J. PSYCHIATRY 1397 (Aug. 2006) ............................................................... 33

S.P. Segal *et al.*, *Factors Associated with Involuntary Return to a Psychiatric*

    *Emergency Service within 12 Months*,

    49-9 PSYCHIATRIC SERVICES, 1212-17 (Sept. 1998)................................................. 37

Steven P. Segal, *Civil Commitment Law, Mental Health Services, and US Homicide Rates*,

    47 SOCIAL PSYCHIATRY & PSYCHIATRIC EPIDEMIOLOGY 1449-58 (2012)............................... 33

*The Address and Reasons of Dissent of the Minority of the Convention of the State of*

    *Pennsylvania to Their Constituents, 1787*, *reprinted in*

    2 Bernard Schwartz, THE BILL OF RIGHTS, A DOCUMENTARY HISTORY 665 (1971) .............. 18

V.A. Hiday, *Civil Commitment: A Review of Empirical Research*,

    6 Behav. Sci. & L. 15 (Winter 1988)........................................................................ 35

## <u>INTRODUCTION</u>

The Gun Control Act of 1968 prohibits any individual who has been involuntarily "committed to a mental institution" or "adjudicated as a mental defective" from, *inter alia*, receiving and possessing firearms. Wary of the potential dangers that could flow from permitting such individuals access to guns, Congress sensibly imposed this prophylactic prohibition to guard against those dangers. In *District of Columbia v. Heller*, the Supreme Court recognized an individual right under the Second Amendment to keep and bear arms in the home for self-defense purposes, but the Court also observed that certain conduct could "disqualify" a person from exercising this right. The Court specifically cited individuals with mental illness as an example of those whom the government, consistent with the Constitution, could presumptively prohibit from acquiring and possessing guns. This conclusion is supported by ample historical evidence, including from the Founding era.

Plaintiff, who has been committed as a result of mental illness, is disqualified; he thus does not fall within the protections of the Second Amendment. Even if he did, his Second Amendment right would not be infringed by the statutory provision he challenges. Section 922(g)(4) is designed to disarm those who, in Congress's judgment, pose an unacceptable risk of danger to the public. Consistent with a multitude of empirical studies, the provision relies upon a reasonable indication of dangerousness—whether a person has been committed to an institution or adjudicated as mentally ill—as a basis for that disarmament. It would therefore satisfy the appropriate level of scrutiny were the Court to conduct any means-ends analysis of the legislation. Since *Heller*, no court to have considered a constitutional challenge to § 922(g)(4), whether brought under the Second Amendment or pursuant to principles of due process, has vindicated such a challenge. This Court should follow suit and dismiss Plaintiff's Complaint.

## STATUTORY BACKGROUND

**I.    SECTION 922(g)(4)**

In 1968, Congress enacted the Gun Control Act ("GCA"), which prohibited any person "who has been adjudicated as a mental defective or who has been committed to a mental institution" from shipping or transporting any firearm in interstate or foreign commerce, from possessing in or affecting commerce any firearm, and from receiving any firearm that had been shipped or transported in interstate or foreign commerce.  *See* Pub. L. No. 90-618, tit. 1, § 102, 82 Stat. 1213, 1220-21 (1968) [former 18 U.S.C. § 922(g)-(h)].  In 1986, in the Firearm Owners' Protection Act ("FOPA"), Congress consolidated these provisions into one section: 18 U.S.C. § 922(g)(4).  *See* Firearm Owners' Protection Act, Pub. L. No. 99-308, § 102(6)(D), 100 Stat. 449, 452 (1986); H.R. Rep. No. 99-495, at 23 (1986).

Legislative history reveals that Congress intended to include both the currently mentally ill and those with a history of such illness, and was concerned not only about potential violence to others, but also with suicide risks for these very individuals.  The then-Chairman of the House Judiciary Committee stated, "No one can dispute the need to prevent drug addicts, mental incompetents, *persons with a history of mental disturbances*, and persons convicted of certain offenses, from buying, owning or possessing firearms.  This bill seeks to maximize the possibility of keeping firearms out of the hands of such persons."  114 Cong. Rec. 21,784 (1968)

(Rep. Celler) (emphasis added).  Other legislators' contemporaneous remarks confirm this intent.[1]

Congress also intended to address increased risks of suicide by firearms.  One congressman recited the following statistics: "In 1966, 6,855 Americans were murdered by gun; 10,407 suicides and 2,600 fatal accidents involved firearms."  114 Cong. Rec. 21,774 (Rep. Rosenthal); *see also id.* at 21,775 ("The United States is far and away the No. 1 leader in the world in both the absolute number and . . . rate of homicides, suicides, and accidents by firearms.") (Rep. Rosenthal); *id.* at 21,784 ("It is not only deliberate murder, robbery and assault which this legislation seeks to reduce, but also acts of passion, and gun suicides which have grown to 11,000 in 1967.") (Rep. Celler); *id.* at 21,819 (stressing that "the manic depressive contemplating suicide will find it more difficult to take his own life, or that of a friend or relative") (Rep. Halpern).  Congressman Schwengel further explained:

> To [statistics regarding gun crimes] must be added yet another tragic toll of firearm deaths.  In the last decade, 92,747 Americans took their own lives with a firearm, reflecting the fact that the surest and easiest way to commit suicide is with a gun.  Such weapons, if immediately at hand, enable a person to kill himself quickly, painlessly, and with little or no inconvenience.  The ease with which firearms are acquired in the United States no doubt contributes to our massive total of firearm suicides and a rate for

---

[1] *See* 114 Cong. Rec. at 21,804 ("We cannot continue to put a gun casually into the hands of anyone, whatever his mental state, who fancies to have one.") (Rep. Farbstein); *id.* at 21,809-10 (stating that law is "aimed at those individuals who *by their previous conduct or mental condition or irresponsibility* have shown themselves incapable of handling a dangerous weapon in the midst of an open society") (Rep. Tenzer) (emphasis added); *id.* at 21,829 (characterizing goal of the legislation to "cut down or eliminate firearms deaths caused by persons who are not criminals, but who commit sudden, unpremeditated crimes with firearms as a result of mental disturbances") (Rep. Bingham); *see also United States v. Waters*, 23 F.3d 29, 35 (2d Cir. 1994) ("A perusal of the legislative history of the statute indicates that Congress would broadly apply the prohibition against the ownership of firearms by 'mentally unstable' or 'irresponsible' persons.").

3

such tragedies six times that of West Germany, 15 times that of England, and 50 times that of Japan.

*Id.* at 21,811.

## II.     SECTION 925(c)

The Gun Control Act of 1968 also included a provision under which an individual convicted of a felony—and who was thereby prohibited from possessing firearms under federal law—could apply to the federal government for "relief from the disabilities imposed by Federal laws."  GCA § 102, 82 Stat. at 1225 (codified as amended at 18 U.S.C. § 925(c)).  In the Firearm Owners' Protection Act, Congress expanded this relief-from-disabilities program ("RFDP") to cover not only convicted felons, but also any person whom the Gun Control Act "prohibited from possessing, shipping, transporting, or receiving firearms," which includes individuals who have been committed to a mental institution or adjudicated mentally ill.  FOPA § 105(1)(A), 100 Stat. at 459; *see generally U.S. Dep't of the Treasury v. Galioto*, 477 U.S. 556 (1986).[2]

The federal RFDP was in effect from 1986 until 1992, when Congress denied funding to ATF to act upon any application for relief.  *See* Treasury, Postal Service, and General Government Appropriations Act, 1993, Pub. L. No. 102-393, 106 Stat. 1732; *see also United States v. Bean*, 537 U.S. 71, 74-75 (2002).  This appropriations restriction has remained in place since 1992 without interruption.  *See, e.g.*, Consolidated and Further Continuing Appropriations Act of 2012, Pub. L. 112-55, 125 Stat. 552, 609 (providing that "none of the funds appropriated

---

[2] To implement this statutory revision, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") promulgated final regulations on March 31, 1988 setting forth the requirements for a relief application.  *See* Commerce in Firearms and Ammunition; Final Rule, 53 Fed. Reg. 10,480, 10,506 (March 31, 1988) (codified at 27 C.F.R. § 478.144).  Pursuant to 28 C.F.R. § 0.130(a)(1), the Attorney General has delegated his authority to "[i]nvestigate, administer, and enforce" the Gun Control Act to ATF.

4

herein shall be available to investigate or act upon applications for relief from Federal firearms

disabilities under 18 U.S.C. 925(c)"); *Bean*, 537 U.S at 75 n.3.

The House Report on the 1992 appropriations restriction explained the basis for failing to

fund the federal RFDP:

> Under the relief procedure, ATF officials are required to guess
> whether a convicted felon or a person committed to a mental
> institution can be entrusted with a firearm.  After ATF agents
> spend many hours investigating a particular applicant for relief,
> there is no way to know with any certainty whether the applicant is
> still a danger to public safety.  Needless to say, it is a very difficult
> task.  Thus, officials are now forced to make these decisions
> knowing that a mistake could have devastating consequences for
> innocent citizens.
>
> Thus, the Committee believes that the $3.75 million and the 40
> man-years annually spent investigating and acting upon these
> applications for relief would be better utilized by ATF in fighting
> violent crime.  Therefore, the Committee has included language
> which states that no appropriated funds be used to investigate or
> act upon applications for relief from Federal firearms disabilities.

H.R. Rep. No. 102-618, at 14 (1992).  The Senate Report expressed a similar rationale by

concluding that the review of RFDP applications is "a very difficult and subjective task which

could have devastating consequences for innocent citizens if the wrong decision is made."  S.

Rep. No. 102-353, at 19 (1992).  Congress evidently concluded that the "devastating

consequences" that could arise from an erroneous administrative determination of future non-

dangerousness, coupled with the expense associated with such determinations, were too great to

risk rearming disqualified individuals.  As a result of the appropriations restriction, ATF "is

effectively prohibited from processing applications for relief under § 925(c)."  *Mullis v. United*

*States*, 230 F.3d 215, 217 (6th Cir. 2000).

III.     **THE NICS IMPROVEMENT AMENDMENTS ACT OF 2007**

In 2007, Congress acted to improve the National Instant Criminal Background Check System ("NICS") by passing the NICS Improvement Amendments Act of 2007 ("NIAA"). Pub L. No. 110-180, 121 Stat. 2559 (2008) (codified at 18 U.S.C. § 922 note).[3]  The NICS was established pursuant to the Brady Handgun Violence Prevention Act of 1993 to provide firearms dealers with real-time information on whether a prospective purchaser can lawfully possess a gun, or rather if the purchaser is prohibited from doing so by federal or state law.  It is a computerized system that queries several national databases simultaneously, using the purchaser's name and other identifiers (*e.g.*, date of birth, residence), to determine whether those databases contain information indicating that the purchaser is not permitted to possess a gun. The databases contain information from both state and federal sources, but state information constitutes the bulk of the information accessed by the NICS.[4]  Among other things, the NIAA authorizes federal grants to assist States to improve the quality of information they make available to those databases.  NIAA § 103(a)(1); *see also* 153 Cong. Rec. 15,969 (2007) (Sen. Schumer) (explaining that the NIAA "gets States critical resources they need to upgrade the mental health and conviction records they use to screen prospective gun buyers").  However, a State is only eligible to receive such a grant if it certifies to ATF that the State has implemented its own RFDP for individuals whose firearm possession is restricted under § 922(g)(4).  *See*

---

[3] In enacting the NIAA, Congress cited "the deadliest campus shooting in United States history," on April 16, 2007 at the Virginia Polytechnic Institute and State University.  NIAA § 2(9).  In addition to this incident, Congress cited the "senseless shooting," on March 12, 2002, of two individuals at a church in New York state, and further noted that the perpetrator "had a prior disqualifying mental health commitment."  *Id.* § 2(8).

[4] *See* Federal Bureau of Investigation, *National Instant Criminal Background Check System*, http://www.fbi.gov/about-us/cjis/nics.

NIAA § 103(c) ("To be eligible for a grant under this section, a State shall certify, to the satisfaction of the Attorney General, that the State has implemented a relief from disabilities program in accordance with section 105.").

Section 105 of the NIAA sets forth criteria that a State RFDP must meet for the State to qualify for a federal grant. Specifically, that program must permit a person to whom § 922(g)(4) applies to obtain relief if a specified State court, board, commission, or other authority determines "that the person will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." NIAA § 105(a)(2). Furthermore, the State RFDP must allow an unsuccessful applicant to seek judicial review of that decision in state court. NIAA § 105(a)(3).

Section 105 was thus intended to "permit a person disqualified on the basis of legal mental illness to prove to the State that he or she no longer poses a danger to society." 153 Cong. Rec. 12,352 (Rep. McCarthy); *see* 153 Cong. Rec. 15,971 (Sen. Leahy) (explaining that the NIAA "urges the States" to "establish relief from disabilities programs through which individuals who have overcome a disqualifying mental illness or disability may reclaim their rights"). The Act's sponsor in the House explained the federalism principles underlying the NIAA's incentive to States to create RFDPs for those previously adjudged to be mentally ill:

> I recognize that mental illness is not necessarily a permanent impediment. *Since the State made the initial determination of mental illness, that State should be able to remove that determination.* . . . H.R. 2640 would . . . allow States to establish procedures that permit a person disqualified on the basis of legal mental illness to prove to the State that he or she no longer poses a danger to society.

153 Cong. Rec. 12,352 (Rep. McCarthy) (emphasis added). To date, twenty States have created qualifying RFDPs under § 105 of the NIAA.[5] Michigan, the State of Plaintiff's alleged residence, has not sought to create a State RFDP program.

## PLAINTIFF'S COMPLAINT

In his Complaint for Declaratory Judgment and Injunctive Relief, Plaintiff Clifford Charles Tyler alleges that, pursuant to an order of the Hillsdale County Probate Court, he was involuntarily committed on January 2, 1986 to a Michigan state hospital. Compl. ¶ 22; *id.*, Ex. A (hereinafter "Commitment Order").[6] According to the Commitment Order, the probate court found, by clear and convincing evidence, that Mr. Tyler was "a person requiring treatment because the individual is mentally ill, and as a result of that mental illness . . . can be reasonably expected within the near future to intentionally or unintentionally seriously physically injure self or others, and has engaged in an act or acts or made significant threats that are substantially supportive of the expectation." Commitment Order at 1. The Commitment Order further states that no "treatment program other than hospitalization [is] adequate to meet the person's treatment needs." *Id.* The probate court ordered that Mr. Tyler undergo a treatment program for

---

[5] These States are Arizona, Connecticut, Florida, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Missouri, Nebraska, Nevada, New Jersey, New York, North Dakota, Oregon, Texas, Virginia, West Virginia, and Wisconsin.

[6] For purposes of this Motion to Dismiss, the Court must "accept all facts alleged in the complaint as true," although "[m]ere legal assertions and conclusions contained in the complaint need not be accepted as true." *Boland v. Holder*, 682 F.3d 531, 534 (6th Cir. 2012). Because Plaintiff's Complaint refers to the exhibits attached thereto and because those exhibits are central to Plaintiff's claims, the Court may also consider their contents in deciding this motion. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) ("When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto . . . so long as they are referred to in the Complaint and are central to the claims contained therein."); *accord* 5B Wright & Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2012).

a maximum of 90 days, to include "hospitalization for a period not to exceed 30 days" and alternative treatment under the supervision of hospital staff. *Id.*at 2.

On February 7, 2011, Mr. Tyler attempted to purchase a firearm but was prohibited from doing so. Compl. ¶ 26. He alleges that the Hillsdale County Sheriff's Office explained that his prior commitment was the reason for the denial. Compl. ¶¶ 26-28. Mr. Tyler unsuccessfully appealed the denial to the NICS Section of the Federal Bureau of Investigation, which, on September 8, 2011 and January 6, 2012, further informed him that § 922(g)(4) applied to him and that he was therefore prohibited from purchasing a firearm. Compl. ¶¶ 30-34, Exs. E, F. On May 21, 2012, Plaintiff filed his three-count Complaint in this Court.

Plaintiff raises a mix of claims against Federal Defendants. Count I alleges a Second Amendment violation, and Count II alleges Fifth Amendment equal protection and due process violations. Compl. ¶¶ 43-56. In Count I, Plaintiff mounts an as-applied constitutional challenge to § 922(g)(4): he claims that Federal Defendants' enforcement of that provision against him, so long as no federal RFDP is operative due to congressional appropriations restrictions and no qualifying RFDP exists in Michigan, constitutes "an over-broad infringement and an impermissible burden upon Plaintiff's right to keep and bear arms under the Second Amendment." Compl. ¶ 48. In Count II, Plaintiff makes several more as-applied challenges to the statutory scheme. He first claims that § 922(g)(4)'s alleged restriction of his firearms rights, "without providing for a means to seek review and relief" from those restrictions, amounts to an equal protection violation under the Due Process Clause of the Fifth Amendment. Compl. ¶ 53. Plaintiff further claims that the operation of § 922(g)(4) against him, without notice and an opportunity to be heard prior to the loss of his firearm rights, amounts to a due process violation. Compl. ¶ 54. Finally, he claims that the lack of "a post-deprivation proceeding to seek review

9

and relief" from the firearms disability imposed by the statute also constitutes a due process violation.  Compl. ¶ 54.

Plaintiff seeks declaratory relief and a permanent injunction prohibiting Federal Defendants from enforcing § 922(g)(4) against him, unless he is given an opportunity to seek relief from the firearm disability it imposes.  Compl. at 13, ¶ D.  As demonstrated below, none of Plaintiff's claims against Federal Defendants has merit, and all of those claims should therefore be dismissed in their entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).[7]

## **ARGUMENT**

Plaintiff contends, in this as-applied challenge, that the lack of any mechanism for demonstrating his purported fitness to possess and purchase firearms, notwithstanding his disqualification pursuant to 18 U.S.C. § 922(g)(4), violates the Second and Fifth Amendments to the U.S. Constitution.  Plaintiff does not dispute that he has been "committed" within the meaning of § 922(g)(4).[8]  *See* Compl. ¶¶ 5, 22 (admitting that Plaintiff "was involuntarily committed" on January 2, 1986); *id.* ¶ 53 (characterizing Plaintiff as an "individual[] who ha[s] been involuntarily committed").  Plaintiff does not contest that Congress may generally, without offending the Second Amendment, regulate the firearm rights of individuals with a history of mental illness.  Nor does Plaintiff claim that the application of § 922(g)(4) will always amount to a constitutional violation.  His claim is instead limited to his own specific circumstances.  In other words, Plaintiff does not raise a facial challenge to § 922(g)(4).

---

[7] To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *See Paige v. Coyner*, 614 F.3d 273, 277 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[8] For sake of brevity and for purposes of this lawsuit only, we use the term "committed" in this memorandum to mean "involuntarily committed" unless indicated otherwise.

Plaintiff's challenge fails.  Because the conduct regulated by § 922(g)(4)—gun possession by an individual who has been involuntarily committed—falls outside the scope of the Second Amendment as historically understood, there has been no deprivation of a constitutionally protected right.  Indeed, the Supreme Court has recognized that "longstanding prohibitions on the possession of firearms by . . . the mentally ill" are "presumptively lawful regulatory measures" that do not implicate the Second Amendment right.  *District of Columbia v. Heller* 554 U.S. 570,  626-27 & n.26 (2008).  Even if the Court were to find that Plaintiff fell within the Second Amendment's protections, the continuing nature of § 922(g)(4)'s ban in these circumstances does not infringe upon those rights because it satisfies, at a minimum, intermediate scrutiny, which numerous courts have held is the appropriate level of scrutiny to be applied.

Plaintiff's Fifth Amendment claims also fail.  First, the Sixth Circuit has rejected an attempt to repackage a Second Amendment claim under cover of due process or equal protection.  Moreover, Plaintiff has no viable equal protection claim because individuals with a history of mental illness have not been recognized as a suspect class, and there was, at minimum, a rational basis for Congress to have restricted the firearms rights of such individuals.  Nor has Congress subjected this alleged class to differential treatment: the unavailability of the federal RFDP extends not only to previously committed individuals, but also to the other types of individuals who have been disarmed under § 922(g)'s myriad subsections.  Meanwhile, Plaintiff's due process claim that he lacked notice of § 922(g)(4)'s prohibition is unavailing: the Supreme Court has held that knowledge of the prohibition is not a required element for a § 922(g) violation, and the Sixth Circuit has repeatedly rejected similar "ignorance of the law" arguments in the § 922(g) context.  Due process doctrine does not otherwise require any more procedural protections than

11

the abundant process Mr. Tyler received upon his commitment in 1986.  Finally, the Fifth

Amendment does not affirmatively require Congress to provide a functional disability-relief

program—or for Michigan to provide a State RFDP—as Plaintiff apparently desires.  In sum,

Plaintiff has failed to state any claim upon which relief may be granted, and his Complaint

against Federal Defendants must accordingly be dismissed.

## I.    NO INDIVIDUAL CAPACITY CLAIMS AGAINST FEDERAL OFFICIALS HAVE BEEN OR MAY BE ASSERTED HERE.

Plaintiff purports to sue Defendants Holder, Jones, Brandon, and Mueller in their

individual capacities.[9]  Every court of appeals to address the issue has ruled that a government

official cannot be sued in an individual capacity for equitable relief.[10]  As the Sixth Circuit has

explained, "[j]ust as a plaintiff cannot sue a defendant in his official capacity for money

damages, a plaintiff should not be able to sue a defendant in his individual capacity for an

injunction in situations in which the injunction relates only to the official's job, *i.e.*, his official

capacity."  *Comm. Mental Health Servs. of Belmont v. Mental Health & Recovery Bd.*, 150 F.

App'x 389, 401 (6th Cir. 2005).  In addition, Plaintiff's specific allegations against these four

_____

[9] Plaintiff has not filed in the docket any proof that these federal officials have been served in their individual capacities.

[10] *See, e.g.*, *Kirby v. City of Elizabeth*, 388 F.3d 440, 452 n.10 (4th Cir. 2004) (concluding that injunctive relief can only be awarded against a government employee in his or her official capacity); *Wolfe v. Strankman*, 392 F.3d 358, 360 n.2 (9th Cir. 2004) ("[T]he declaratory and injunctive relief Wolfe seeks is only available in an official capacity suit."); *Frank v. Relin*, 1 F.3d 1317, 1327 (2d Cir. 1993) ("[S]uch equitable relief [reinstatement] could be obtained against Relin only in his official, not his individual, capacity."); *Scott v. Flowers*, 910 F.2d 201, 213 (5th Cir. 1990) ("[T]he injunctive relief sought and won by Scott can be obtained from the defendants only in their official capacity as commissioners."); *Feit v. Ward*, 886 F.2d 848, 858 (7th Cir. 1989) ("[T]he equitable relief Feit requests – a declaration that the policy is unconstitutional and an injunction barring the defendants from implementing the policy in the future – can be obtained only from the defendants in their official capacities, not as private individuals.").

federal official defendants explicitly reference alleged actions taken in their "official capacity." *See, e.g.*, Compl. ¶ 6 ("Defendant Holder, *in his capacity as Attorney General*, is presently enforcing the unconstitutionally broad ban . . . ." (emphasis added)); *id.* ¶ 9 ("Defendant Jones is the Acting Director of the ATF and, *in that capacity*, is presently enforcing the laws . . . complained of in this action." (emphasis added)).  Thus, Plaintiff does not even purport to set forth any valid allegations against them in their individual capacities.  For these reasons, all purported individual capacity claims must be dismissed.[11]

## II.      PLAINTIFF'S SECOND AMENDMENT CLAIM LACKS MERIT.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In *District of Columbia v. Heller*, the Supreme Court determined that the Second Amendment confers an individual right to keep and bear arms for lawful purposes such as self-defense in the home, 554 U.S. at 595, and held that "the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self defense."  *Id.* at 635. The Court emphasized that the right to bear arms under the Second Amendment "is not unlimited," and that, as a historical matter, "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id.* at 626.  *Heller*'s holding was narrow, and the Court recognized only the "core" right of "law-abiding, responsible citizens to use arms in defense of hearth and home."  *Id.* at 634-35.

---

[11] The Department of Justice notes that it is not appearing for or defending these federal officials in their individual capacities because they have not properly been sued in their individual capacities.

The *Heller* Court further noted that an individual must be *qualified* to exercise the Second Amendment right recognized by its decision.  *Heller*, 554 U.S. at 635 ("Assuming that Heller *is not disqualified* from the exercise of Second Amendment rights, the District must permit him to register his handgun . . . ." (emphasis added)).  It made clear that firearm prohibitions based on specified conduct or predicate status do not implicate the Second Amendment, cautioning that

> nothing in our opinion should be taken to cast doubt on
> *longstanding prohibitions on the possession of firearms by felons
> and the mentally ill*, or laws forbidding the carrying of firearms in
> sensitive places such as schools and government buildings, or laws
> imposing conditions and qualifications on the commercial sale of
> arms.

554 U.S. at 626-27 (emphasis added).  The Court described such measures as "presumptively lawful."  *Id.* at 626-27 & n.26.  In a subsequent decision holding that the Second Amendment applies to the States, the Court "repeat[ed] those assurances" that *Heller* did not call into question the constitutionality of these regulatory measures.  *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3047 (2010) (plurality opinion).

These rulings indicate that the Second Amendment's protections are contingent upon the absence of conduct or circumstances that may be disqualifying.  In a post-*Heller* ruling, the Sixth Circuit implicitly agreed with this premise.  *See United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010) (explaining that expungement of a conviction would "allow [the defendant felon] to *regain* his Second Amendment rights); *see also United States v. Skoien*, 614 F.3d 638, 639 (6th Cir. 2010) (en banc) ("The reference to being 'disqualified' relates to prior convictions *and mental illness*." (emphasis added)); *United States v. Marzzarella*, 614 F.3d 85, 91-92 (3d Cir. 2010) ("[*Heller*] suggests felons and the mentally ill are *disqualified* from exercising their Second Amendment rights." (emphasis added)).  Plaintiff himself appears to recognize this analytical framework, alleging repeatedly that he seeks "to *regain* his Second Amendment

14

rights."  Compl. ¶ 40; *see also id.* ¶¶ 2, 3 (stating that committed individuals lack any means "to *regain* their Second Amendment right to acquire and possess a firearm").

### A.    The Sixth Circuit's framework for assessing Second Amendment challenges

In deciding Second Amendment challenges to firearm regulation, the Sixth Circuit, like several other courts of appeals, has adopted a "two-pronged" approach.  *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *see also, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 701-03 (7th Cir. 2011); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010).  "Under the first prong, the court asks whether the challenged law burdens conduct that falls within the scope of the Second Amendment right, as historically understood."  *Greeno*, 679 F.3d at 518.  If the government shows that the regulated conduct is beyond the scope of the Second Amendment, as historically understood, it follows that the conduct is "categorically unprotected," and the claim requires no further Second Amendment review.  *Id.*  If the government cannot make this showing, the court moves to the second prong, where it applies "the appropriate level of scrutiny" to determine whether the statutory provision is constitutional.  *Id.*

The conduct regulated by § 922(g)(4)—gun possession by individuals who have been committed to a mental institution—plainly falls outside the scope of the historical understanding of the Second Amendment.  As a historical matter, the founding generation did not even contemplate firearms regulation for the mentally ill, largely because harsher, more draconian measures against such individuals were commonplace and the lesser regulation of firearm use was therefore unnecessary.  Plaintiff's constitutional challenge thus founders at the first prong of the Court's Second Amendment inquiry.  Even if this Court were to disagree and conclude that gun possession by those who have been committed for mental illness was within the contours of

the right to bear arms, as historically understood, Plaintiff's claim would nonetheless fail the second *Greeno* prong.  That is because § 922(g)(4) is substantially related to protecting the public (including the committed individual) from firearm-related violence, which is an important—if not compelling—governmental interest.  The regulation therefore satisfies, at a minimum, intermediate scrutiny, which, numerous courts have held, is the "appropriate level of scrutiny" under *Greeno*.

**B.      The Second Amendment does not extend to individuals who have been committed as a result of mental illness.**

As stated above, Mr. Tyler was committed to a Michigan state hospital based on the probate court's finding that he was mentally ill, and that as a result he could reasonably be expected to cause serious physical injury to himself or others, and had acted or made threats to act on that expectation.  *See* Commitment Order at 1.  In *Heller*, the Court characterized as presumptively lawful "longstanding prohibitions on the possession of firearms by . . . the mentally ill."  554 U.S. at 626-27 & n.26.  The Sixth Circuit has accorded this language "significant weight," *United States v. Khami*, 362 F. App'x 501, 507 (6th Cir. 2010) (unpublished), and the Fourth Circuit held that a Second Amendment challenge to § 922(g)(4) "founders" on this very same language, *see United States v. McRobie*, 2009 WL 82715, at *1 (4th Cir. 2009) (unpublished).  Only last week, the Ninth Circuit relied on this passage from *Heller* to summarily reject a Second Amendment challenge to § 922(g)(4), concluding that the statute, as applied to an individual adjudicated as a mental defective, "imposed constitutional permissible limits on the right to bear arms."  *Petramala v. U.S. Dep't of Justice*, 2012 WL 4357925, at *1 (9th Cir. Sept. 25, 2012).  This Court should likewise conclude that, based on the Supreme Court's language in *Heller*, Plaintiff is not qualified to exercise the Second Amendment

16

right to keep and bear arms.[12]  Even if it does not settle the matter outright, as both the Fourth

Circuit and the Ninth Circuit have concluded, this language strongly indicates that those who

have suffered from mental illness so acute that it required institutional commitment may be

disarmed without offending the Second Amendment.

An historical analysis of the right to bear arms confirms this view.  From its origins in

English law to the Nation's Founding, the right to keep and bear arms was understood not to

extend to citizens whose possession of firearms posed a danger to themselves or others.  *See*

*Heller*, 554 U.S. at 635 (recognizing right of "law-abiding, responsible citizens" to use firearms

in the home for self-defense); *United States v. Rene E.*, 583 F.3d 8, 15 (1st Cir. 2009) (noting "a

longstanding practice of prohibiting certain classes of individuals from possessing firearms—

those whose possession poses a particular danger to the public").  *Heller* identified the right to

arms recognized in the 1689 English Declaration of Rights as "the predecessor of our Second

Amendment."  554 U.S. at 593.  That document provided "[t]hat the subjects which are

Protestants may have arms for their defense suitable to their conditions and as allowed by law."

1 W. & M., c. 2, § 7, *in* 3 Eng. Stat. at Large 441 (1698).[13]  Moreover, even after adoption of the

Declaration of Rights, lieutenants of the militia (appointed by the King) could and did disarm

"any person or persons" judged "dangerous to the Peace of the Kingdome" under the 1662

Militia Act.  13 & 14 Car. 2, c. 3, § 1 (1662) (Eng.) (emphasis added).  *See* Joyce Lee Malcolm,

---

[12] If the Court were to consider this language from *Heller* to be dicta, it would
nonetheless be obligated to follow it, since its rationale has not been undercut and there is no
reason otherwise to disregard it.  *See ACLU of Ky. v. McCreary County*, 607 F.3d 439, 447 (6th
Cir. 2010) ("Lower courts are obligated to follow Supreme Court dicta, particularly where there
is not substantial reason for disregarding it, such as age or subsequent statements undermining its
rationale." (quotation omitted)).

[13] Upon the Court's request Federal Defendants will submit copies of any of the cited
historical reference materials, as well as copies of the empirical studies cited *infra*.

To Keep and Bear Arms 123 (1994); *accord* Patrick J. Charles, *"Arms for Their Defence"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated In* McDonald v. City of Chicago, 57 Clev. St. L. Rev. 351, 373, 376, 382-83, 405 (2009).

In the colonies, disarmament of individuals perceived to be dangerous was also frequent, and such actions were not viewed as inconsistent with the right to bear arms.  Malcolm, *supra*, at 140-41; Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 Geo. L.J. 309, 323-27 (1991).  The right to bear arms was viewed as "limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." Saul Cornell, *"Don't Know Much About History" The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 671 (2002).

The documentary record surrounding adoption of the Constitution further confirms this conclusion.  Most significantly, the Pennsylvania anti-federalist faction offered the following proposal at the Pennsylvania Convention:

> That the people have a right to bear arms for the defense of themselves and their own state or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, unless for crimes committed, *or real danger of public injury from individuals* . . . .

The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787, *reprinted in* 2 Bernard Schwartz, The Bill of Rights, A Documentary History 665 (1971) (emphasis added).  The *Heller* Court found this Pennsylvania Minority proposal to be both "highly influential" and a "precursor[]" to the Second Amendment.  554 U.S. at 603-04.  In Massachusetts, Samuel Adams offered a similar amendment at the ratifying convention, recommending "that the said Constitution be never

construed to authorize Congress . . . to prevent the people of the United States *who are peaceable citizens*, from keeping their own arms."  Schwartz, *supra*, at 674-75, 681 (emphasis added). Although not identical to the Pennsylvania proposal, this formulation likewise reflected an understanding that arms could be denied to those whose demonstrated inability to control their behavior caused a threat to public safety.

Both of these proposals support the view that "[i]n classical republican political philosophy, the concept of a right to arms was inextricably and multifariously tied to that of the 'virtuous citizen.' . . . One implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous citizens (*i.e.*, criminals) or those who, like children *or the mentally unbalanced*, are deemed incapable of virtue."  Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 LAW & CONTEMP. PROBS. 143, 146 (1986) (emphasis added); *see* Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 HASTINGS L.J. 1339, 1359-62 (2009); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 492 (2004); Robert E. Shalhope, *The Armed Citizen in the Early Republic*, 49 LAW & CONTEMP. PROBS. 125, 130 (1986).

This historical backdrop confirms *Heller*'s indication that the right to keep and bear arms would not have extended at the Founding to persons who had suffered from mental illness that was reasonably likely to cause danger to themselves or the public.  The lack of laws formally disarming such persons does not suggest otherwise.  Instead, it merely reflects a larger absence, in the "decentralized" and "rural" colonies, of "systematic policies" regarding the mentally ill. Gerald N. Grob, THE MAD AMONG US: A HISTORY OF THE CARE OF AMERICA'S MENTALLY ILL 5, 13, 21 (1994).  During the colonial period, "[m]ental illness was perceived to be an individual

19

rather than a social problem." *Id.* at 5. Accordingly, families were largely expected to address it on their own, while protecting others from any resulting harm. *See generally id.* at 5-21; Mary Ann Jimenez, CHANGING FACES OF MADNESS: EARLY AMERICAN ATTITUDES AND TREATMENT OF THE INSANE 49 (1987). In cases where government involvement was needed, local officials responded on an "ad hoc" basis. Grob, *supra*, at 15; Jimenez, *supra*, at 57; Shomer S. Zwelling, QUEST FOR A CURE: THE PUBLIC HOSPITAL IN WILLIAMSBURG, VIRGINIA, 1773-1885, at 3 (1985) ("[T]he insane in Virginia were . . . dealt with by local officials in a haphazard and unsystematic fashion."). "Disordered persons," who threatened public safety were dealt with harshly, by confining them in tiny rooms, cells or cages. Grob, *supra*, at 15-16; Jimenez, *supra*, at 43, 92. This response obviated any general need to legislate against firearm possession by the mentally ill. Accordingly, while colonial "analogues" to § 922(g)(4) do not appear to exist, the historical record confirms *Heller*'s indication that individuals who have suffered from mental illness fall entirely outside the scope of the Second Amendment.[14]

Plaintiff is thus within a category of individuals whose possession and acquisition of firearms may be freely regulated without offending the Second Amendment, as historically understood. It follows that Plaintiff cannot successfully assert a Second Amendment violation when he does not fall within the protection of the Second Amendment. Because firearm possession by an individual committed for reason of prior mental illness does not "burden[]

---

[14] Notably, Senator Dodd articulated the same position at the outset of the hearings which ultimately led to passage of the Gun Control Act: "Even in early America when arms were a natural part and a necessary part of a man's property, mental defectives, felons, and chronic drunkards were not encouraged to carry firearms. The restrictions may not have appeared on the lawbooks, but they were enforced nevertheless." *Hearings Before the Subcomm. to Investigate Juvenile Delinquency*, *Senate Comm. on the Judiciary*, 88th Cong. 3185 (Jan. 29, 1963) (Sen. Dodd, Subcomm. Chairman), *available at* http://www.lexisnexis.com/congcomp/getdoc?HEARING-ID=HRG-1963-SJS-0001.

conduct that falls within the scope of the Second Amendment right, as historically understood,"

that activity is "categorically unprotected," and Plaintiff's claim fails the first prong of the

Second Amendment inquiry.  *Greeno*, 679 F.3d at 518.  This conclusion obviates any further

analysis of this claim by the Court, and it should accordingly be dismissed.  *Id.* at 518.[15]

> **C.** **Section 922(g)(4) nonetheless satisfies the "appropriate level" of judicial scrutiny because it is substantially related to an important governmental interest.**

Even if this Court were to reject the historical analysis above and conclude that

individuals who have been hospitalized for mental illness based on a risk of injury to themselves

or others nevertheless have a Second Amendment right to purchase and possess firearms,

Plaintiff's claim would still fail.  Because § 922(g)(4) satisfies the appropriate level of scrutiny,

Plaintiff's claim falters on the second prong of the *Greeno* inquiry.  As numerous courts have

held, intermediate scrutiny is, at most, the appropriate standard to be applied to Second

Amendment challenges to firearm legislation.  When scrutinized under that standard, it is readily

apparent that § 922(g)(4)'s prohibition on gun possession by previously committed individuals is

substantially related to the important—indeed, compelling—government interest in protecting

the public (including the committed individual) from armed violence.

---

[15] Plaintiff's ability to access firearms may also be beyond Second Amendment protection for a separate, independent reason: he does not appear to be a law-abiding citizen.  To his Complaint, Plaintiff attached two professional evaluations of his psychological state and potential substance abuse history.  The psychological evaluation reports that Plaintiff "enjoys shooting pistols competitively," that "he has used guns as a hobby," and that he stated that he has "always had guns."  Compl. Ex. B.  The substance abuse evaluation reports that Plaintiff disclosed that "he goes to gun shows where he swaps and trades guns on the weekends."  Compl. Ex. C.  If these reports are accurate (and Plaintiff's allegations give no reason to disbelieve them), he has been consistently violating § 922(g)(4) by shooting, using, swapping, trading, and otherwise possessing firearms on an ongoing basis.  He is therefore not a "law-abiding citizen" who, as the Supreme Court suggested in *Heller*, is "qualified" to exercise his rights under the Second Amendment.  554 U.S. at 634.

**1.      At most, intermediate scrutiny is the appropriate standard to be applied to a Second Amendment challenge under prong two of the *Greeno* analysis.**

Neither the Supreme Court nor the Sixth Circuit has held that Second Amendment challenges to section 922(g) trigger strict scrutiny.  Nor would a strict scrutiny approach be easy to reconcile with *Heller* itself.  "[A]s the *Heller* dissent and numerous other courts and legal scholars have pointed out, a strict scrutiny standard of review would not square with the majority's references to presumptively lawful regulatory measures."  *Heller v. District of Columbia* ("*Heller II*"), 698 F. Supp. 2d 179, 187 (D.D.C. 2010); *see Heller*, 554 U.S. at 688 (Breyer, J., dissenting) ("[T]he majority implicitly, and appropriately, rejects [a 'strict scrutiny' test] by broadly approving a set of laws . . . whose constitutionality under a strict scrutiny standard would be far from clear.").  Consistent with this rationale (and mindful of *Heller*'s rejection of rational basis review, *see id.* at 628 n.27 (majority opinion)), most courts have instead applied an intermediate standard of review to Second Amendment challenges.  Although the Sixth Circuit in *Greeno* did not decide the issue, *see* 679 F.3d at 520 n.2, at least four of its

sister circuits have concluded that intermediate scrutiny is appropriate.[16]  Numerous district

courts, including at least one in this circuit, have done the same.[17]

    In adopting intermediate scrutiny, courts have borrowed from First Amendment doctrine,

under which "the level of scrutiny [courts] apply depends on the nature of the conduct being

regulated and the degree to which the challenged law burdens the right."  *Chester*, 628 F.3d at

682; *Marzzarella*, 614 F.3d at 96-97.  Relevant factors to the inquiry have included the nature of

the firearm regulation at issue (*e.g.*, a prohibition vs. a restriction), the proximity of the conduct

regulated to the core Second Amendment right recognized in *Heller*, and the scope of the

population affected by the regulation.  Although § 922(g)(4) creates an initial prohibition, the

---

[16] *See, e.g.*, *Chester*, 628 F.3d at 682-83 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 801-02 (10th Cir. 2010) (upholding 18 U.S.C. § 922(g)(8), which disarms persons subject to domestic violence protective orders, under intermediate scrutiny); *Yancey*, 621 F.3d at 683, 687 (7th Cir. 2010) (upholding 18 U.S.C. § 922(g)(3), which disarms unlawful drug users, under intermediate scrutiny standard); *United States v. Williams*, 616 F.3d 685, 692-94 (7th Cir. 2010) (upholding 18 U.S.C. § 922(g)(1), as applied to violent felons, under intermediate scrutiny); *Marzzarella*, 614 F.3d at 95-101 (3d Cir. 2010) (upholding 18 U.S.C. § 922(k), which prohibits possession of a firearm with an obliterated serial number, under intermediate scrutiny); *but see Ezell v. City of Chicago*, 651 F.3d 684, 708-09 (7th Cir. 2011) (applying a standard "more rigorous" than intermediate scrutiny but short of strict scrutiny, in a case brought by "law-abiding, responsible citizens" to vindicate an interest close to the "core of the Second Amendment right").

[17] *See United States v. Miller*, 604 F. Supp. 2d 1162, 1171 (W.D. Tenn. 2009) (finding intermediate scrutiny the "appropriate standard"); *see also e.g.*, *Peterson v. LaCabe*, 783 F. Supp. 2d 1167, 1177 (D. Colo. 2011) (upholding law requiring applicant for permit to carry concealed weapon to be state resident under intermediate scrutiny); *GeorgiaCarry.Org, Inc. v. Georgia*, 764 F. Supp. 2d 1306, 1317 (M.D. Ga. 2011) (upholding law prohibiting carrying of firearms in a place of worship under intermediate scrutiny), *aff'd* 687 F.3d 1244 (11th Cir. 2012); *United States v. Smith*, 742 F. Supp. 2d 855, 870 (S.D. W. Va. 2010) (upholding § 922(g)(9), which prohibits firearm possession by domestic violence misdemeanants, under intermediate scrutiny); *Heller II*, 698 F. Supp. 2d at 188 ("[This] court joins the majority of courts to have considered this issue in holding that intermediate scrutiny is the most appropriate standard of review to apply to [laws implicating the core Second Amendment right]."); *United States v. Bledsoe*, 2008 WL 3538717, at *4 (W.D. Tex. Aug. 8, 2008) (applying intermediate scrutiny in a Second Amendment challenge to § 922(b)(1)), *aff'd on other grounds*, 334 F. App'x 711 (5th Cir. 2009).

statute does not apply broadly to the general public, nor does it implicate the core Second Amendment right *Heller* identified. The fact that a firearm restriction "applies only to a narrow class of persons, rather than to the public at large" has been found a critical factor in adopting intermediate scrutiny. *Reese*, 627 F.3d at 802. Further, when, as here, a plaintiff's claim does not implicate the "core right identified in *Heller*—the right of a *law-abiding, responsible* citizen to possess and carry a weapon for self-defense," the government's task of showing a proper justification is more easily met. *Chester*, 628 F.3d at 682-83; *see Heller*, 554 U.S. at 635. Consistent with previous decisions reviewing the restrictions of § 922(g) under intermediate scrutiny, this Court should apply no more than intermediate scrutiny to § 922(g)(4).

Applying no more than intermediate scrutiny is also appropriate in the present case in light of the standards under which regulations related to mental illness are ordinarily evaluated. *See, e.g.*, *Ernst J. v. Stone*, 452 F.3d 186, 200 (2d Cir. 2006) (approving application of intermediate scrutiny to state law provision allowing commitment of defendants acquitted by reason of insanity); *Francis S. v. Stone*, 221 F.3d 100, 112 (2d Cir. 2000) (same); *Bernstein v. Pataki*, 233 F. App'x 21, 26 (2d Cir. 2007) ("Where civilly committed patients allege that they are being subjected to the denial of a fundamental right . . . intermediate scrutiny applies."); *cf. Ciavone v. McKee*, 2009 WL 2959737, at *11 (W.D. Mich. Sept. 10, 2009) (noting that mentally ill persons are not a suspect class for purposes of equal protection analysis); *Coleman v. Martin*, 363 F. Supp. 2d 894, 902 (E.D. Mich. 2005) (applying rational basis review to Michigan parole scoring system that penalizes inmates treated for mental illness).

Because courts have applied intermediate scrutiny to Second Amendment challenges with near uniformity, and because the law at issue regulates in an area where, at their least deferential,

24

courts apply intermediate scrutiny, this Court, should it find reason to conduct a means-ends analysis of § 922(g)(4), should apply no more than intermediate scrutiny.

>    **2.    Section 922(g)(4) substantially relates to the important governmental interest of preventing firearm violence and therefore withstands intermediate scrutiny.**

To satisfy intermediate scrutiny, "a statutory classification must be substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988); *Craigmiles v. Giles*, 312 F.3d 220, 223 (6th Cir. 2002).  A primary governmental objective underlying § 922(g)(4) is to protect the public from "armed mayhem" in the form of firearm violence, *Skoien*, 614 F.3d at 642, and thereby to preserve peace and public safety.  This interest is compelling, let alone important.  *Grider v. Abramson*, 180 F.3d 739, 751 (6th Cir. 1999) (stating that the "public interest in preserving community peace and safety" is "compelling"); *Johnson v. City of Cincinnati*, 310 F.3d 484, 502 (6th Cir. 2002) (stating that protection of citizens' health, safety, and welfare "represents a compelling government interest"); *see also United States v. Salerno*, 481 U.S. 739, 755 (1987) ("[The] *primary concern* of every government [is] for the safety and indeed the lives of its citizens.").  There is a related government interest in protecting committed individuals themselves from self-inflicted firearm violence such as suicide.  The Supreme Court has recognized the government interest in suicide prevention as "unquestionably important and legitimate," *Washington v. Glucksberg*, 521 U.S. 702, 735 (1997), and the Second Circuit has found it to be compelling, *see Grand Jury Subpoena John Doe v. United States*, 150 F.3d 170, 172 (2d Cir. 1998) (finding "prevention of suicide" a "compelling governmental interest[]").  As stated above, intermediate scrutiny requires only that the government show an "important" interest, and the interests sought to be achieved have here been held to be not only important but also compelling.

A substantial relationship exists between these governmental objectives and disarming individuals who have been committed, particularly those, such as Plaintiff, who have been committed based on a finding that mental illness creates a reasonable expectation of serious physical injury.  This conclusion is sustained by two considerations which find substantial empirical support in the medical literature.  First, individuals who have been committed pose an enhanced risk of violence involving firearms.  Second, individuals who are involuntarily committed, even if they enjoy long periods free from illness, are frequently subject to relapse into mental illness and, hence, potential dangerousness.

Furthermore, the fact that § 922(g)(4), as currently applied to Plaintiff, effects a continuing prohibition on his firearm acquisition and possession, should not alter the conclusion.  Congress's decision to adopt a prophylactic prohibition against the "presumptively risky" category of individuals who have been committed, rather than set forth, for example, criteria for assessing future dangerousness on an individualized basis, was a reasonable response to the problem of gun violence that it sought to address.  Under intermediate scrutiny, "[a]ll that is required is 'a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served.'"  *Neinast v. Bd. of Trustees of Columbus Metro. Library*, 346 F.3d 585, 594 (6th Cir. 2003) (quoting *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989)); *Marzzarella*, 614 F.3d at 98 (intermediate scrutiny only "require[s] the fit between the challenged regulation and the asserted objective be reasonable, not perfect").

26

a)  **It was reasonable for Congress to rely on past commitment based on mental illness rather than particularized evidence of future dangerousness as a basis for disarmament.**

By enacting the prohibitions in the Gun Control Act, Congress sought to limit firearm availability "to those whose possession thereof was contrary to the public interest." *Huddleston v. United States*, 415 U.S. 814, 824 (1974). "Congress' intent in enacting § 922(g) . . . was to keep firearms out of the hands of *presumptively* risky people." *Dickerson v. New Banner Inst.*, 460 U.S. 103, 112 n.6 (1983) (emphasis added); *Barrett v. United States*, 423 U.S. 212, 220 (1976) (citing legislative history reflecting a concern with "keeping firearms out of the hands of categories of *potentially* irresponsible persons" (emphasis added)).[18]  Consistent with this intent, § 922(g) is not limited to individuals who have *already* committed dangerous or violent acts, since Congress instead "considered the mere risk or potential for violence or irresponsible use sufficient reason to prohibit certain categories of persons from possessing firearms." *United States v. Chamberlain*, 159 F.3d 656, 660 (1st Cir. 1998), *overruled on other grounds by United States v. Rehlander*, 666 F.3d 45 (1st Cir. 2012).  In the case of § 922(g)(4), Congress relied on a history of commitment or adjudicated mental illness as the basis for the prophylactic firearm prohibition.  *See* 114 Cong. Rec. 14,773 (1968) (Sen. Long) (stating that mentally ill individuals, "by their actions have demonstrated that they are dangerous, *or that they may become dangerous*" (emphasis added)); *id.* at 21829 (Rep. Bingham) (stressing that the purpose of

---

[18] *See* S. Rep. No. 1501, at 22 (1968).  Representative Celler, the House Manager, stated: "This bill seeks to maximize the possibility of keeping firearms out of the hands of [persons with a history of mental disturbances]." 114 Cong. Rec. 21,784 (1968) (Rep. Celler).

prohibiting "mental incompetents" "is to prevent firearms from falling in to the hands of those *most likely to misuse them*" (emphasis added)).[19]

Plaintiff contends that the prohibition is an "over-broad infringement and an impermissible burden." Compl. ¶ 48. However, it was reasonable for Congress to rely on these criteria as the relevant indicia of future violence risk rather than attempting to craft a regime in which individualized predictions of future violence were the standard in the first instance. Such individualized predictions would impose extraordinarily difficult, if not impossible, burdens on government officials, and Congress was entitled to adopt a statutory scheme that relied instead on objective, historical data. As the First Circuit explained,

> Congress did not prohibit gun possession by those who were or are mentally ill and dangerous, and such a free floating prohibition would be very hard to administer, although perhaps not impossible. This is why, as with the ban on prior felons, Congress sought to piggyback on determinations made in *prior judicial proceedings* to establish status.

*Rehlander*, 666 F.3d at 50; *cf. Weinberger v. Salfi*, 422 U.S. 749, 777 (1975) ("Congress . . . could rationally have concluded . . . that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule."); *Chamberlain*, 159 F.3d at 660 ("To require a full-scale adversary proceeding and a finding, by clear and convincing evidence, that a person is mentally ill and poses a likelihood of harm to himself or others before

---

[19] Unlike some (but not all) subsections of § 922(g), subsection (g)(4) is phrased in the present perfect tense, indicating that Congress did not intend the prohibition to lapse after the expiration of, or a change in, the predicate status. *Compare* 18 U.S.C. § 922(g)(4) (". . . who has been adjudicated as a mental defective or who has been committed to a mental institution . . . .") with § 922(g) *with id.* § 922(g)(2) (". . . who *is* a fugitive from justice . . . ."); *id.* § 922(g)(3) (". . .who *is* an unlawful user of or addicted to any controlled substance . . . ."); § 922(g)(5) (". . . who, being an alien, *is* illegally or unlawfully in the United States . . . ."); § 922(g)(8) (". . . who *is* subject to [specified] court order[s] . . . .")

28

giving effect to the firearms ban would undermine Congress's judgment that risk or potential, not likelihood, probability, or certainty, of violence is all that is required.").  Moreover, the Supreme Court has recognized the inherent difficulty in making such "free floating" and particularized assessments of dangerousness.  It has cited the views of members of the psychiatric community "that clinical predictions as to whether a person would or would not commit violent acts in the future are 'fundamentally of very low reliability' and that psychiatrists possess no special qualifications for making such forecasts." *Estelle v. Smith*, 451 U.S. 454, 472 (1981); *Barefoot v. Estelle*, 463 U.S. 880, 899-901 & n.7 (1983).

Plaintiff is correct that there is no mechanism for him to seek relief from his § 922(g)(4) disability.  This outcome reflects Congress's evident determination that "such a person, though unfortunate, was too much of a risk to be allowed firearms privileges." *Dickerson*, 460 U.S. at 116.  It equally reflects, however, the State of Michigan's sovereign determination not to implement a mental health RFDP for its residents, as is otherwise authorized under the NIAA.  Federal Defendants recognize that some individuals to whom § 922(g)(4) is applicable will not engage in, or even contemplate, gun violence.  Yet Congress—and apparently the State of Michigan—has chosen to err on the side of caution, and it was entitled to conclude that such caution is warranted where to do otherwise "could have devastating consequences for innocent citizens."  H.R. Rep. No. 102-618, at 14.

Plaintiff's contention that the Second Amendment obligates the government to afford him an opportunity to demonstrate his allegedly renewed fitness to possess a firearm finds no support in the case law.  To begin with, prior to *Heller*, multiple federal courts upheld the continuing prohibition against individuals who had been committed to mental health facilities and were later released or found to be competent. *See, e.g.*, *Redford v. U.S. Dep't of Treasury*, 691 F.2d 471,

29

473 (10th Cir. 1982) (holding the prohibition of the federal gun control statute against those adjudicated mentally incompetent "provides no exceptions for people who have regained their competency or sanity or who have been released from confinement"); *United States v. Buffaloe*, 449 F.2d 779, 780 (4th Cir. 1971) (per curiam) ("We also conclude that the [federal gun control] statute is not unconstitutional as to [appellant] because 16 months later he was discharged from the hospital."); *United States v. Jones*, 569 F. Supp. 395, 398–99 (D.S.C. 1983) (finding that the statute did not unjustly punish persons who had been, at one point, adjudicated mentally ill). And neither *Heller* nor *McDonald* suggested that there was any durational limitation on otherwise lawful firearm regulations.

Furthermore, a recent, post-*Heller* decision by the First Circuit strongly undermines Plaintiff's contention that the Second Amendment forbids a continuing prohibition.  In *United States v. Rehlander*, the First Circuit, applying the doctrine of constitutional avoidance, held that a proceeding under Maine's ex parte emergency hospitalization procedure did not constitute a "commitment" for purposes of § 922(g)(4).  666 F.3d at 47.  Confronted with the possibility that applying § 922(g)(4)'s continuing prohibition to an individual "committed" on this basis would raise serious Second Amendment concerns, the court instead determined that "section 922 should not be read to encompass a temporary hospitalization attended only by the ex parte procedures of section 3863."  *Id.* at 49.  Section 3863, the Maine commitment procedure, permitted hospitalization "without any adversary proceeding and with no finding by an independent judicial or even administrative officer that the subject is either mentally disturbed or dangerous" and without hearing from the subject whatsoever.  *Id.* at 48.  The court stated that, following *Heller*, "the right to possess arms (among those not properly disqualified) is no longer something that can be withdrawn by government on a permanent and irrevocable basis without due

30

process." *Id.* at 48 (emphasis added).  The court concluded that it was "evidently doubtful" that the Maine emergency hospitalization procedure under review "provides the necessary process for a permanent deprivation." *Id.*

However, and of particular relevance to Plaintiff's claim here, the court went on to state that "[b]y contrast," commitment rendered under section 3864, which provides far greater procedural safeguards than section 3863, "creates a "presumptively valid" § 922(g)(4) "ban as to future gun possession." *Id.* at 50.  The court stressed that a commitment under section 3864 "is allowed only after a court holds an adversary hearing—providing counsel for the patient and an opportunity to testify and to call and cross-examine witnesses." *Id.* at 48.  "The committing court must then itself determine whether there is clear and convincing evidence that the patient is mentally ill and poses a likelihood of serious harm." *Id.*  The more protective Maine commitment procedure that the *Rehlander* court endorsed, in dicta, for purposes of a continuing § 922(g)(4) prohibition is, for all material purposes, equivalent to the Michigan process under which Mr. Tyler was committed.[20]  Thus, even to an appellate court willing to consider the possibility that a perpetual firearm prohibition based on minimal procedural protections would

---

[20] Assuming the unchallenged regularity of the probate court proceedings, *see United States v. Foley*, 871 F.2d 235, 240 (1st Cir. 1989), the 1986 Michigan procedure under which Mr. Tyler was committed, *see* Mich. Comp. Laws §§ 330.1451–68 (versions in effect in 1986), would have given him prompt notice of the filing of a petition for involuntary hospitalization, as well as a copy thereof. *Id.* § 330.1453(1)-(2).  Plaintiff would also have been told "of his right to a full court hearing, notice of his right to be present at the hearing, notice of his right to be represented by legal counsel, notice of his right to demand a jury trial, and notice of his right to an independent medical evaluation." *Id.* § 330.1453(2).  He would have received this notice "at the earliest practicable time and sufficiently in advance of the hearing date to permit preparation for the hearing." *Id.* § 330.1453(1).  He had "the right to present documents and witnesses and to cross-examine witnesses." *Id.* § 330.1459(1).  Finally, a judge or a jury was required to find, "by clear and convincing evidence," that the subject required treatment before he could be involuntarily committed.  *Id.* § 330.1465.  Indeed, the face of the Commitment Order shows that Plaintiff was in fact present and was represented by counsel at an adversary hearing.

raise serious constitutional concerns, such concerns were effectively eliminated when the prohibition was measured against procedural safeguards equivalent to those that were enjoyed by Plaintiff. *Rehlander*'s dicta is thus strongly persuasive authority for the proposition that, even if construed to impose a continuing prohibition, § 922(g)(4) would survive intermediate scrutiny.

If it reaches the second *Greeno* prong, this Court should conclude that § 922(g)(4) is substantially related to an important governmental interest and dismiss Plaintiff's Second Amendment claim.

**b)** **Though not required to satisfy intermediate scrutiny, empirical evidence shows that persons who have been involuntarily committed pose an enhanced risk of violence, including suicide, and a continuing prohibition is therefore reasonable.**

The above discussion demonstrates that § 922(g)(4) passes intermediate scrutiny because there is a substantial relationship to the harms Congress sought to prevent and the means it chose to achieve that goal. Federal Defendants have no additional obligation to produce concrete evidence in support of Congress's legislative judgment. *Cf. Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000) (explaining that the "quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised"); *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (noting that even under strict scrutiny, some restrictions on speech can be upheld "based solely on history, consensus, and 'simple common sense'"). However, were this Court to demand such empirical evidence, it is available.[21] The following citations from a substantial body of psychological and psychiatric research indicate that committed individuals pose an enhanced risk

---

[21] For examples of courts' reliance on such empirical data in conducting Second Amendment means-end analyses, *see United States v. Staten*, 666 F.3d 154, 163-67 (4th Cir. 2011); *Skoien*, 614 F.3d at 643-44.

of violence and that recurrence of mental illness is common.  These studies further underscore the reasonableness of Congress's decision to impose a continuing firearm prohibition, subject to the State's creation of a relief program.

Congress appropriately determined that people who have previously been involuntarily committed pose an unacceptable risk of misusing firearms because they are susceptible to future episodes of mental illness.  Indeed, the Gun Control Act "is designed to prohibit the ownership of firearms not only by individuals who have already committed dangerous acts, but also by those with *a potential for violence*."  *United States v. Waters*, 23 F.3d 29, 34 (2d Cir. 1994) (emphasis added).  To achieve that purpose, Congress relied not on actual evidence of future dangerousness but on past commitment or adjudication of mental illness, and as the studies below indicate, it was reasonable for Congress to have done so.

First, research suggests that persons who suffer from significant mental illness pose an increased risk of harm to themselves or others.  Seena Fazel *et al.*, *The Population Impact of Severe Mental Illness on Violent Crime*, 163 AM. J. PSYCHIATRY 1397, 1401 (Aug. 2006) (reporting higher dangerousness risk "in patients with severe mental illness compared with the general population").  One way to measure such harm is to consider the rate of job-related violence experienced by mental health workers.  Between 1993 and 1999, the annual rate of non-fatal, job-related crime was 12.6 per 1,000 workers in all occupations, but 69 per 1,000 for mental health and custodial workers.  R.A. Friedman, M.D., *Violence and Mental Illness—How Strong Is the Link?*, NEW ENGLAND J. MED. 2064 (2006); *see also* Steven P. Segal, *Civil Commitment Law, Mental Health Services, and US Homicide Rates*, 47 SOCIAL PSYCHIATRY & PSYCHIATRIC EPIDEMIOLOGY 1449-58 (2012).

33

In addition, a National Institute of Mental Health ("NIMH") study showed "that patients with serious mental illness—those with schizophrenia, major depression, or bipolar disorder—were two to three times as likely as people without such an illness to be assaultive.  In absolute terms, the lifetime prevalence of violence among people with serious mental illness was 16% . . . compared with 7% among people without mental illness."  Friedman, *supra*, at 2065. Other research has shown that discharged mental patients with a co-existing substance-abuse diagnosis have a dramatically increased violence rate.  H.J. Steadman *et al.*, *Violence by People Discharged From Acute Psychiatric Inpatient Facilities and by Others in the Same Neighborhoods*, 55 ARCH. GEN. PSYCHIATRY 393-401 (1998).  Furthermore, a more recent study indicates that, irrespective of substance abuse status, individuals with severe mental illness were more likely to be violent than those without any history of mental or substance abuse disorder. *See* Richard Van Dorn *et al.*, *Mental Disorder and Violence*, 47 SOCIAL PSYCHIATRY & PSYCHIATRIC EPIDEMIOLOGY 487, 487 (2012).

Mentally ill individuals also have a significantly increased risk of suicide.[22]  The NIMH reports that over 90 percent of people who die by suicide have a mental disorder, a substance-abuse disorder, or both.[23]  The suicide rate for individuals with active psychiatric disorders is 7 to 10 times the rate for the general population.  B.L. Tanney, *Psychiatric Diagnoses and Suicidal*

---

[22] This problem is one of staggering dimension.  In 2007, suicide was the tenth leading cause of death in the United States, accounting for 34,598 deaths.  National Institute of Mental Health, *Suicide in the U.S.: Statistics and Prevention*, http://www.nimh.nih.gov/health/publications/suicide-in-the-us-statistics-and-prevention/index.shtml.

[23] *Id.*; *see also* Frederick E. Vars & Amanda E. Adcock, *Do the Mentally Ill Have a Right to Bear Arms?*, 48 WAKE FOREST L. REV. ___, 21 (forthcoming 2012) ("Ninety percent (or more) of suicide victims in the United States suffered from mental illness."), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2146767.

*Acts*, *in* R.W. Maris *et al.*, Comprehensive Textbook of Suicidology 339 (New York 2000);

Vars & Adcock, *supra* n.23, at 21 (reporting that "the mentally ill are over 10 times more likely

to commit suicide").  In keeping with these statistics, the Substance Abuse and Mental Health

Services Administration reported that, in 2004, a psychiatric condition was diagnosed in 41

percent of emergency department visits involving drug-related suicide attempts.[24]  Consistent

with this data, the suicide rate among people who have previously been committed is high.  V.A.

Hiday, *Civil Commitment: A Review of Empirical Research*, 6 Behav. Sci. & L. 15, 25 (Winter

1988) (among 189 patients who entered the commitment process, 10 had committed suicide

within 19 months).

Perhaps not surprisingly, firearms are much more likely to cause injury or death than

other available weapons, such as knives.  One study concluded that domestic violence incidents

involving firearms are 12 times more likely to result in the death of the victim than non-firearm-

related domestic violence incidents.  *See* L.E. Saltzman *et al.*, *Weapon Involvement and Injury*

*Outcomes in Family and Intimate Assaults*, 267 J. Am. Med. Ass'n 22 (1992).  The same

observation applies to suicide because, as one commentator has noted, "[a] suicide attempt with a

firearm rarely affords a second chance," while "[a]ttempts involving drugs or cutting, which

account for more than 90% of all suicidal acts, prove fatal far less often." M. Miller & D.

Hemenway, *Guns and Suicide in the United States*, 359 New England J. Med. 989-91 (2008).

---

[24] Office of Applied Studies, Substance Abuse and Mental Health Services
Administration, Suicidal Thoughts, *The OAS Report: Suicide Attempts, Major Depressive
Episode, and Substance Use among Adults*, at 5 (2006), *available at*
http://www.oas.samhsa.gov/suicide.cfm.

Because there are an estimated 11 attempted suicides for every suicide death,[25] the inference is strong that removing firearms from the hands of the mentally ill can save lives. J.R. Simpson, *Bad Risk? An Overview of Laws Prohibiting Possession of Firearms by Individuals With a History of Treatment for Mental Illness*, 35 J. AM. ACAD. PSYCHIATRY LAW 330, 338 (2007) (concluding that "individuals with psychiatric diagnoses may be at higher risk of suicide if there are firearms in their households"); M.A. Ilgen *et al.*, *Mental Illness, Previous Suicidality, and Access to Guns in the United States*, 59 PSYCHIATRIC SERVICE 198-200 (2008) (explaining that restricting access to lethal means is one of only two suicide interventions with reasonable empirical support). Additional examination of data by suicide method revealed that

> [h]aving a gun in the home was a strong risk factor for gun-related suicide . . . but was inversely related to committing suicide with a nonfirearm method . . . . That is, persons with a gun in the home were more likely than others to use a gun to commit suicide and less likely than others to commit suicide by means of drug overdose, hanging, or other method . . . .

Douglas J. Wiebe, *Homicide and Suicide Risks Associated With Firearms in the Home: A National Case-Control Study*, 41 ANNALS OF EMERGENCY MED. 771, 777 (Jun. 2003).

This evidence establishes that mentally ill persons are more likely than the general public to cause harm to themselves or others, and that the presence of firearms could exacerbate the harm they cause. Moreover, many civil commitment provisions, including the provision under which Mr. Tyler was committed, require a showing that an individual poses a risk of harm to himself or others. Thus, such individuals are especially likely to pose a danger during episodes of mental distress, which, as shown below, are subject to recurrence.

---

[25] NIMH, *Suicide in the U.S.: Statistics and Prevention*, *supra* n.22.

c)      **Empirical studies indicating a high rate of recurrence of mental illness further support Congress's decision to impose a continuing disability under § 922(g)(4).**

It is well established that "the course of many major mental disorders alternates between episodes of exacerbation and periods of remission."  D.E. McNeill *et al.*, *The Relationship Between Aggressive Attributional Style and Violence by Psychiatric Patients*, 71 J. CONSULTING & CLINICAL PSYCHOL. 399, 401 (2003).  Statistics involving persons involuntarily committed confirm that relapse is common.  For example, "[a]s many as one-third of the patients admitted to a psychiatric emergency service are likely to return within the year."  S.P. Segal *et al.*, *Factors Associated with Involuntary Return to a Psychiatric Emergency Service within 12 Months*, 49-9 PSYCHIATRIC SERVICES, 1212-17 (Sept. 1998).  Another study found that 55 percent of those committed for short periods were rehospitalized within 22 months.  Hiday, *supra*, at 33.  These "high rehospitalization rates" are "not surprising given that many do not obtain treatment after leaving the hospital despite their high levels of psychoses."  *Id.*

Moreover, as compared to others whose mental illness is equally severe, people who have been involuntarily committed may pose an especially high risk of a serious relapse.  Involuntary commitments by their nature occur only when the patient fails to seek treatment voluntarily.  The fact that such intervention is needed suggests the patient lacks the capacity for exercising a rational choice between seeking treatment or continuing in turmoil.  *See* D.H.J. Herman, *Barriers to Providing Effective Treatment: A Critique of Revisions in Procedural, Substantive, and Dispositional Criteria in Involuntary Civil Commitment*, 39 VAND. L. REV. 83, 100 (1986).  Accordingly, such patients may be especially likely to spiral out of control when mental illness recurs in the future.

These studies and conclusions, although unnecessary to the Court's decision under intermediate scrutiny, further demonstrate that previously committed individuals may suffer from an increased risk of violence and a continued susceptibility to mental illness.  All of this evidence supports Congress's conclusion that, absent findings through a State RFDP that they are no longer likely to endanger public safety, persons who have been involuntarily committed at any time in the past should not possess firearms.  Congress's conclusion, to be sure, is based on a predictive judgment about future behavior that may not prove prescient in every case.  The Supreme Court, however, has noted "that a reviewing court should [defer] to a legislative determination that, in essence, predicts a potential for future criminal behavior."  *Lewis v. United States*, 445 U.S. 55, 67 n.9 (1980).  And, in any event, intermediate scrutiny does not require that the legislature predict with perfect accuracy.  *See Neinast*, 346 F.3d at 594; *Heller II*, 698 F. Supp. 2d at 191; *Miller*, 604 F. Supp. 2d at 1172 (W.D. Tenn. 2009) (concluding that intermediate scrutiny does not demand "the most precisely focused means to achieve [the] end" of preventing gun violence).[26]  Plaintiff's contention that § 922(g)(4) amounts to an "over-broad infringement and an impermissible burden" upon his alleged Second Amendment rights should be rejected.  Even if the Court were to decide that Plaintiff's claim survives the first prong of *Greeno*, the claim must nonetheless be dismissed because it fails the second prong.

---

[26] The *Miller* court cited the observation of one commentator that "most legislation will assert broad safety concerns and broad gun control measures to match, covering both 'good' and 'bad' gun possessors and 'good' and 'bad' guns.  Such legislation cannot be narrowly tailored to reach only the bad people who kill with their innocent guns."  604 F. Supp. 2d at 1172 n.13 (quoting Donald Dowd, *The Relevance of the Second Amendment to Gun Control Legislation*, 58 MONT. L. REV. 79, 111 (1997).  The court further noted another commentator's view that "due to the intensity of public opinion on guns, legislation is inevitably the result of hard-fought compromise in the political branches.  To expect such legislation to reflect a tight fit between ends and means is unrealistic."  *Id.* (quoting Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 731 (2007)).

## III.  PLAINTIFF'S CLAIMS UNDER THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT LACK MERIT.

In Count II of his Complaint, Plaintiff tries to advance three claims under the Fifth Amendment's Due Process Clause.  These claims track Plaintiff's Second Amendment claim and are in large part duplicative.  The Sixth Circuit has explicitly rejected such an attempt to "conflate the enumerated Second Amendment right with Equal Protection and Due Process protections under the Fifth Amendment."  *United States v. Carey*, 602 F.3d 738, 741 n.2 (6th Cir. 2010); *see also Nordyke v. King*, 644 F.3d 776, 794 (9th Cir. 2011) (rejecting equal protection claim because "although the right to keep and to bear arms for self-defense is a fundamental right, that right is more appropriately analyzed under the Second Amendment" (citation omitted)), *vacated by* 681 F.3d 1041 (9th Cir. 2012) (en banc); *cf. Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.").  Furthermore, even if the substance of Plaintiff's claim is arguably unique to equal protection or due process doctrines, the claims lack merit and should be dismissed.

### A.  Plaintiff fails to state a valid equal protection claim.

The Equal Protection Clause of the Fourteenth Amendment expressly applies only to the States; however, the Supreme Court has found that its protections are encompassed by the Due Process Clause of the Fifth Amendment and therefore apply to the federal government.  *Bolling v. Sharpe*, 347 U.S. 497 (1954).  Count II of Plaintiff's Complaint challenges, as a violation of Plaintiff's "right to equal protection of the laws," section 922(g)(4)'s applicability to individuals

39

who have been involuntarily committed insofar as it does not allow "a means to seek review and relief" from its prohibitions, Compl. ¶ 53.  As noted above, the Sixth Circuit has disapproved the practice of styling claims as equal protection violations when they in fact allege violations of the Second Amendment.  *Carey*, 602 F.3d at 741 n.2.  Regardless, even if analyzed under equal protection doctrine, this claim is meritless.

"To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis."  *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (internal quotation omitted).  Plaintiff cannot meet this standard.  First, the government has already shown that the conduct regulated by § 922(g)(4) does not implicate a fundamental right, as historically understood under the Second Amendment.  Second, and relatedly, the government has demonstrated that § 922(g)(4) not only has a rational basis, but also that it survives review under the more stringent intermediate scrutiny standard.  Third, neither

individuals with a history of involuntary commitment, nor individuals with a history of mental illness, have been held to be a suspect class under equal protection doctrine.[27]

Finally, Plaintiff's equal protection theory is flawed to the extent that it rests on the premise that previously committed individuals are uniquely affected by the unavailability of the § 925(c) federal RFDP. The congressional appropriations restrictions since 1992 have not denied funds to adjudicate relief applications from a particular class of prohibited individuals, but have instead denied funding to process *any* application, regardless of the specific prohibitor at issue. Relief at the federal level from the disability is thus unavailable to all classes of prohibited individuals under § 922(g), and Congress has not singled out previously committed persons for special treatment.[28] The funding restriction therefore does not, as Plaintiff might have this Court believe, draw an invidious distinction based on a history of mental illness. Instead, it embodies a congressional judgment that is not limited to the initial basis for disarmament. The restriction does not therefore "isolate the mentally ill or subject them, as a

---

[27] *See, e.g., D.W. v. Rogers*, 113 F.3d 1214, 1219 (11th Cir. 1997) (finding that minors involuntarily committed due to mental illness are not a suspect class); *Weismiller v. Lane*, 815 F.2d 1106, 1110 n.7 (7th Cir. 1987) ("[M]ental illness is not a suspect class."); *Cospito v. Heckler*, 742 F.2d 72, 83 (3d Cir. 1984) ("[C]lassification according to mental illness has not been recognized as a suspect class which requires heightened or strict scrutiny under the equal protection clause."); *J.W. v. City of Tacoma*, 720 F.2d 1126, 1129-30 (9th Cir. 1983) (assuming, without deciding, that "'former mental patients' are not a full-fledged suspect class for purposes of constitutional analysis"); *Ciavone v. McKee*, 2009 WL 2959737, at *11 (W.D. Mich. Sept. 10, 2009); *cf. Schweiker*, 450 U.S. at 231 n.13 (intimating "no view as to what standard of review applies to legislation expressly classifying the mentally ill as a discrete group"); *see also Plyler v. Doe*, 457 U.S. 202, 245 (1982) (Burger C.J., dissenting) ("[A] state legislature is not barred from considering . . . relevant differences between the mentally healthy and the mentally ill . . . simply because these may be factors unrelated to individual choice or to any 'wrongdoing.'").

[28] Other prohibited individuals under § 922(g) include felons, fugitives from justice, unlawful drug users and addicts, certain unlawful aliens, individuals dishonorably discharged from the Armed Forces, individuals who have renounced their American citizenship, individuals subject to domestic violence restraining orders, and domestic violence misdemeanants.

discrete group, to special or subordinate treatment." *Schweiker v. Wilson*, 450 U.S. 221, 231 (1981).  To the contrary, "it imposes equivalent deprivation on other groups who are not mentally ill."  *Id.*  In addition, the NIAA reflects Congress's decision that States should determine whether to offer relief from a firearm disability based on previous commitment.

For all of these reasons, Plaintiff fails to state a viable equal protection claim, and that claim should accordingly be dismissed.

### B. Plaintiff has failed to state a viable due process claim.

Plaintiff's due process claim appears to take two forms.  First, Plaintiff contends that his due process rights have been violated because he was not afforded notice and an opportunity to be heard before his Second Amendment right was allegedly deprived.  Compl. ¶ 54.  Second, Plaintiff contends that his due process rights have been violated because there is no "post-deprivation proceeding to seek review and relief from the deprivation."  *Id.*  Neither contention is actionable under the Due Process Clause.  The Sixth Circuit has repeatedly held that due process does not require actual knowledge of § 922(g)'s prohibitions, and the Constitution does not confer any individualized "opportunity to be heard" on generally applicable legislative measures.  To the extent Plaintiff contends he lacked an opportunity to be heard in connection with his 1986 commitment, the Michigan procedure under which Plaintiff was committed provided robust protections that satisfied due process.  Finally, Plaintiff's contention that the Due Process Clause entitles him to a post-deprivation hearing to show lack of dangerousness is meritless in light of the Supreme Court's decision in *Connecticut Department of Public Safety v. Doe*, 538 U.S. 1 (2003), as well as a district court decision rejecting an identical challenge to § 922(g).

1.    **Plaintiff's alleged lack of notice and opportunity to be heard with respect to § 922(g)(4)'s prohibition does not constitute a due process violation.**

Plaintiff first alleges a due process violation because he did not know it was illegal for him to purchase or possess guns.[29]  Section 924(a)(2) of the Gun Control Act provides a *mens rea* element and restricts punishment to "knowing" violations of § 922(g)(4).[30]  The Supreme Court has interpreted this *mens rea* provision to require "knowledge of the facts that constitute the offense"—*e.g.*, an individual must know that he is possessing a firearm—but there is no further requirement that an individual must know that his possession is itself unlawful.  *Bryan v. United States*, 524 U.S. 184, 193 (1998).  Consistent with this interpretation of the Gun Control Act, the argument advanced by Plaintiff has been expressly rejected by the Sixth Circuit on four separate occasions with respect to two other subsections of § 922(g), and at least one district court has rejected the precise argument as to § 922(g)(4).  Indeed, since the *mens rea* requirement was added to the penalty provision in 1986, "[n]o court . . . has held that a defendant must know of his prohibited status under § 922(g)."  *United States v. Butler*, 637 F.3d 519, 524 (5th Cir. 2011) (rejecting defendant's argument that, in order to be convicted of § 922(g)(6) offense, he must have known that he was dishonorably discharged from the Armed Forces).

In *United States v. Baker*, the defendant was convicted of possessing a firearm while subject to a domestic violence protection order under 18 U.S.C. § 922(g)(8).  197 F.3d 211, 213 (6th Cir. 1999).  Baker contended that due process precluded his conviction if he did not know that the law forbade gun possession while subject to the protection order; he argued that the trial

---

[29] *See* Compl., Ex B at 2.  ("Mr. Tyler stated that he . . . *never was informed* that he could not have [guns] in his possession." (emphasis added)).

[30] "Whoever knowingly violates subsection (a)(6), (d), (g), (h), (i), (j), or (o) of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both."  18 U.S.C. § 924(a)(2).

judge's refusal to so instruct the jury was error.  *Id.* at 218.  Citing the "deeply embedded,"

"centuries-old maxim that 'ignorance of the law is no excuse,'" the Sixth Circuit rejected the

argument.  *Id.*  The court first acknowledged that the protection order expressly notified Baker

that he could not lawfully possess firearms.  *Id.* at 219.  However, "even had Baker not received

direct notice of his firearms disability," the court continued, there was no due process violation

because being subjected to a domestic violence protection order "provided [Baker] with notice

that his conduct was subject to increased government scrutiny."  *Id.* at 220.  It was therefore "not

reasonable" for someone in Baker's position "to expect to possess dangerous weapons free from

extensive regulation."  *Id.*  The court determined that the refusal to provide the requested jury

instruction was not error and upheld Baker's conviction.  *Id.*  Relying on *Baker*, the Sixth

Circuit has on at least two occasions subsequently rejected such "ignorance of the law"

challenges to § 922(g)(9) convictions,[31] even when the defendant did not receive actual notice of

the firearm prohibition, as in *Baker*.  *See United States v. Napier*, 233 F.3d 394, 399 (6th Cir.

2000) (finding "no basis for requiring actual notice of the gun prohibition"); *United States v.

Beavers*, 206 F.3d 706, 710 (6th Cir. 2000).[32]

     Further, the Sixth Circuit has reached the same conclusion with respect to § 922(g)(1),

which prohibits gun possession by felons, and has explicitly rejected the due process argument

advanced by Plaintiff.  *See United States v. Haire*, 89 F. App'x 551, 552 (6th Cir. 2004)

(unpublished).  In *Haire*, the defendant was convicted of being a felon in possession.  He

_____

     [31] Section 922(g)(9) differs from § 922(g)(8) in that the predicate status requires having been convicted of a domestic violence misdemeanor, rather than being subject to a domestic violence protection order.

     [32] The *Napier* court further observed that "[e]very circuit court which has considered a [similar] due process challenge . . . has rejected it."  233 F.3d at 398.

contended that he was deprived of due process because he lacked sufficient notice that it was illegal for him to possess a gun. *Id.* Reciting the "longstanding maxim" that ignorance of the law is no excuse, the court of appeals flatly stated: "Haire's purported ignorance of the fact that it was illegal for him to possess guns *does not constitute a due process violation*." *Id.* at 555 (emphasis added). "Haire knew or should have known that, as a felon, his right to possess firearms could be restricted." *Id.*

Finally, in *United States v. Milheron*, the district court considered the precise claim raised by Plaintiff—*i.e.*, that due process requires a fair warning of the firearm prohibitions resulting from an involuntary commitment. 231 F. Supp. 2d 376, 379 (D. Me. 2002). The court noted that "Congress did not intend the full panoply of due process rights to attach to all predicate status determinations falling within the firearm legislation." *Id.* at 380. It further found that firearm possession "is a heavily regulated and dangerous activity, requiring voluntary actions and decisions on Defendant's part," *id.* at 379, determined that a commitment based on a likelihood of harm was "not so innocuous," and concluded that § 922(g)(4) "regulates sufficiently blameworthy conduct to afford Defendant constitutionally adequate notice of the criminal nature of his behavior." *Id.* at 380.

The reasoning of these cases applies with full force here. Although it is not evident from Plaintiff's allegations whether Plaintiff received direct notice of his firearm disability at the time of his commitment, *Beavers* and *Napier* make the answer to that question irrelevant. And the fact that the predicate proceeding involved domestic violence in those cases and mental illness in Plaintiff's case is of no moment because, as *Baker* observed, "the nature of [a] proceeding [giving rise to a prohibited status] has no effect on the constitutionality" of subjecting an individual to a prohibition under § 922(g). 197 F.3d at 217. The conclusion reached by the

45

Sixth Circuit in *Haire* reinforces the understanding that the specific subsection of § 922(g) is not determinative.  Indeed, since Plaintiff was committed by the State based on a finding of reasonable expectation of serious injury to himself or others, he was on notice that he was subject to increased government scrutiny and regulation.  This was the conclusion reached by the district court in *Milheron*, which rejected the exact claim presently advanced by Plaintiff.  Plaintiff's claim that his due process rights were violated when he was prohibited from purchasing and possessing firearms "without being afforded notice and an opportunity to be heard on the matter" is squarely contradicted by binding precedent in the Sixth Circuit (and persuasive authority in the District of Maine).[33]

Plaintiff also claims a due process violation because he was allegedly not afforded "an opportunity to be heard on the matter" before he lost his firearm rights due to commitment.  Compl. ¶ 54.  It is not clear what "matter" Plaintiff refers to, but to the extent he contends that he was owed an "opportunity to be heard" on the generally applicable § 922(g)(4), that position has long ago been rejected by the Supreme Court.  *See Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915) ("General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard.").  Citing *Bi-Metallic*, the Sixth Circuit has explained that "[g]overnmental determinations of a general nature that affect all equally do not give rise to a due process right to

---

[33] Unlike the defendants in *Baker*, *Beavers*, *Napier*, and *Haire*, Plaintiff has not asserted that § 922(g)(4) is unduly vague, technical, or obscure so as to "ensnar[e] individuals engaged in apparently innocent conduct."  *Haire*, 89 F. App'x at 556 (rejecting this argument).  Nor could he successfully do so, in light of the plain language of the provision.  Furthermore, that the cited cases are criminal rather than civil cases does not diminish the weight of the ignorance-of-the-law doctrine.  *See Molina-Crespo v. U.S. Merit Sys. Prot. Bd.*, 547 F.3d 651, 662 (6th Cir. 2008) ("This Court has held . . . that, even in civil suits, 'ignorance of the law' does not excuse the failure to follow it."); *Graham-Humphreys v. Memphis Brooks Museum of Art*, 209 F.3d 552, 561 (6th Cir. 2000).

46

be heard," *Nasierowski Bros. Inv. Co. v. City of Sterling*, 949 F.2d 890, 896 (6th Cir. 1991), and

that "no notice or opportunity to be heard need proceed any legislative action of general

applicability," *37712, Inc. v. Ohio Dep't of Liquor Control*, 113 F.3d 614, 619 (6th Cir. 1997);

*see also, e.g.*, *Tennessee Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 458 (6th Cir. 2009).

Plaintiff's theory that he was entitled to a hearing prior to the enactment of § 922(g)(4), a

generally applicable provision, is meritless, and the claim should be dismissed. [34]

### 2. The absence of a mechanism under federal or Michigan law to obtain relief from § 922(g)(4)'s prohibition does not constitute a due process violation.

Plaintiff contends that his due process rights have been violated because there is no

available hearing process by which he can obtain relief from the § 922(g)(4) prohibitions.

Federal Defendants have already demonstrated that the continuing nature of § 922(g)(4), as

applied to Plaintiff, does not violate any Second Amendment right.  It follows from that

conclusion that there is also no due process violation, since the government has no obligation to

offer Plaintiff the ability to obtain relief from a prohibition that it may lawfully impose.

Moreover, the Sixth Circuit has already held, in a pre-*Heller* case, that "Congress clearly has the

---

[34] Additionally, if Plaintiff is instead asserting that the commitment proceeding did not afford him adequate process, such a claim is likewise foreclosed by *Baker*.  In *Baker*, the defendant argued that the proceeding by which he attained a prohibited status—in that case being made subject to a domestic violence protection order—was required to afford the same procedural safeguards as a criminal prosecution in order to serve as a basis for conviction under § 922(g).  *Baker*, 197 F.3d at 216-17.  The Sixth Circuit rejected this argument.  "The fact that Baker's status makes him criminally liable for possessing a firearm does not imbue the process by which he attained that status with constitutional significance."  *Id.*  The court pointed out that "a legally-relevant status under § 922(g) [*e.g.*, being a drug addict under § 922(g)(3)] may arise in the absence of any formal proceeding" whatsoever.  The court concluded that "the nature of [a] proceeding [giving rise to a prohibited status] has no effect on the constitutionality of" a prosecution under § 922(g).  *Id.*; *see Lewis v. United States*, 445 U.S. 55, 65 (1980) (upholding § 922(g)(1) conviction even upon recognition that defendant's underlying felony conviction may have been unlawful).

power to prevent the ATF from acting on any applications made pursuant to § 925(c) if it chooses." *Mullis*, 230 F.3d at 219. The *Heller* decision casts no doubt on this proposition. Subsequent Congresses routinely revise the legislative judgments of their predecessors by amending or even repealing entire statutes, and as *Mullis* recognized, Congress may accomplish these ends through appropriations provisions rather than through substantive amendments or repeals. *Id.* at 217. [35]

In any event, the Supreme Court has already rejected the due process argument advanced by Plaintiff. *Connecticut Department of Public Safety v. Doe*, 538 U.S. 1 (2003), involved a challenge to Connecticut's sex offender registry, which required all convicted sex offenders to register and provide personal information, which was then publicized by the State. The plaintiff, a convicted sex offender, claimed a due process violation insofar as Connecticut's scheme required him to participate in the registry without affording a hearing to determine whether he was "likely to be 'currently dangerous.'" *Id.* at 4. Like Plaintiff here, the plaintiff in *Doe* sought to establish that he was not actually dangerous. However, because the Connecticut law applied to any individual who had been convicted of a sex offense, without regard to actual dangerousness (like § 922(g)(4) with respect to committed individuals), the Court determined that "due process does not entitle [the plaintiff] to a hearing to establish a fact that is not material" and is "of no consequence" under the Connecticut statute. *Id.* at 7. The Court flatly held that "Plaintiffs who assert a right to a hearing under the Due Process Clause must show that the facts they seek to establish in that hearing *are relevant under the statutory scheme*." *Id.* at 8 (emphasis added). Plaintiff cannot make this showing. The fact he seeks to establish—alleged

---

[35] If Congress were to reach a different policy judgment, it could, without constitutional impediment, elect to re-activate the federal RFDP by providing ATF with funds to process applications.

48

fitness to possess a firearm—is not relevant to § 922(g)(4)'s prohibition.  *Doe* therefore bars the due process claim raised by Plaintiff.[36]

Moreover, in *Black v. Snow*, the district court for the District of Columbia correctly determined that *Doe* "foreclosed" a claim identical to that raised by Plaintiff.  272 F. Supp. 2d 21 (D.D.C. 2003).  In *Black*, the plaintiff, a convicted felon, argued that the unavailability of the § 925(c) federal RFDP constituted a due process violation.  *Id.* at 28.  Black sought "an individualized opportunity to prove that the general reason for which the [§ 922(g)(1)] classification was established does not apply in his individual circumstances," *i.e.*, that "he is not dangerous."  *Id.* at 33-34.  The court, relying on *Doe*, held that "due process does not entitle plaintiff to a hearing to determine whether he is currently dangerous because the results of such a hearing would have no bearing on whether he is subject to the disability imposed by § 922(g)(1)."  *Id.* at 35.  Accordingly, the court rejected the plaintiff's "doom[ed]" due process challenge to the "effective suspension" of § 925(c).  *Id.* at 34-35.  The same rationale applies here.

In light of the general rule announced in *Doe*, and the specific rejection of an identical claim in *Black*, Plaintiff's claim that he is entitled to a "post-deprivation proceeding" for relief from § 922(g)(4) must be dismissed.

---

[36] The *Doe* Court did observe that the plaintiff might still challenge the substantive rule of law under which he was required to register.  Plaintiff has attempted to make such a substantive Second Amendment challenge to § 922(g)(4), but, as demonstrated *supra*, that claim lacks merit.  In such circumstances, as the *Doe* Court put it, "any hearing on current dangerousness is a bootless exercise."  538 U.S. at 7-8.

## <u>CONCLUSION</u>

For the reasons stated above, all claims against Federal Defendants in Plaintiff's

Complaint should be dismissed with prejudice.


Dated: October 1, 2012                        Respectfully submitted,

                                              STUART F. DELERY
                                              Acting Assistant Attorney General

                                              PATRICK A. MILES, JR.
                                              United States Attorney

                                              SANDRA M. SCHRAIBMAN
                                              Assistant Director
                                              Federal Programs Branch

                                               /s/ Andrew Zee
                                              M. ANDREW ZEE (CA Bar #272510)
                                              Trial Attorney
                                              Federal Programs Branch
                                              U.S. Department of Justice, Civil Division
                                              20 Massachusetts Avenue NW, Room 7314
                                              Washington, DC  20530
                                              Telephone:  (202) 305-8648
                                              Fax:  (202) 616-8470
                                              Email:  m.andrew.zee@usdoj.gov

                                              *Counsel for Federal Defendants*